573 F.2d 717
 TEXACO EXPORT, INC., and Chevron Oil Sales Co., Plaintiffs-Appellants,
v.
OVERSEAS TANKSHIP CORP., Defendant,
and
Getty Tankers Ltd., Defendant-Appellee.
UNITED STEAMSHIP CORP., Defendant-Third-Party Plaintiff-Appellee,
v.
GETTY OIL CO., Third-Party Defendant-Appellant.
 Nos. 308, 438, Dockets 77-7358, 77-7382.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1977.
Decided March 2, 1978.
 
 Nicholas J. Healy, New York City (Allan A. Baillie, John D. Kimball, Healy & Baillie, New York City, of counsel), for appellants Texaco Export, Inc. and Chevron Oil Sales Co.
 James M. Estabrook, New York City (Robert A. Hulten, Haight, Gardner, Poor & Havens, New York City, of counsel), for appellee Getty Tankers Ltd. and third party appellant Getty Oil Co.
 Max Taylor, New York City (Raymond J. Burke, Burke & Parsons, New York City, of counsel), for third party appellee United Steamship Corp.
 Before MULLIGAN, OAKES and VAN GRAAFEILAND, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 The transactions which form the basis of these appeals illustrate the Byzantine complexity of international oil dealings as practiced by the major oil companies, the so-called "Seven Sisters." Beneath the corporate mosaics, however, lie relatively simple damage claims which, in the case of the principal appeal, turn upon questions of contractual interpretation and, in the case of the third party appeal, are readily solved by well-recognized principles of damage calculation. On the principal appeal, we reverse and remand to the United States District Court for the Southern District of New York, Edmund L. Palmieri, Judge, with instructions to make, or to refer to the special master to make, specific factual findings on the terms of the two charters involved to determine whether appellants' damages include freight costs. With regard to the third party appeal, we affirm the award of lost voyage profits since they are not too speculative or remote.
 
 I. THE COMMON FACTS
 
 2
 The S/T Wafra was stranded and subsequently destroyed pursuant to governmental authority off the coast of South Africa in February or March, 1971, resulting in a total loss of its cargo of crude oil in bulk. One-half of the cargo was owned by Chevron Oil Sales Co. (Chevron) and one-half by Texaco Export, Inc. (Texaco). They were the plaintiffs below and are the appellants here. The owner of the vessel, defendant-appellee (cross-claim defendant below) was Getty Tankers Ltd. (Getty Tankers). The Wafra was operating under a long-term time charter to Getty Oil Co. (Getty Oil), third party defendant-appellant. By a time charter dated April 7, 1970, Getty Oil subchartered the vessel to United Steamship Corp. (United), defendant below and third party plaintiff-appellee here, for five years. United, in turn, subchartered the Wafra to Overseas Tankship Corp. (Overseas), defendant below, under a twelve-month consecutive voyage charter. In January, 1971, Overseas as disponet owner entered into an oral subcharter with Chevron as charterer for the entire capacity of the vessel (Overseas/Chevron charter), for the carriage of a full cargo of crude oil from Ras Tanura, Saudi Arabia, to Capetown, South Africa. Thereafter, Chevron agreed to an oral charter for one-half of the vessel's carrying capacity with Texaco (Chevron/Texaco charter) at the same rate of freight that Chevron was obligated to pay Overseas under the Overseas/Chevron charter.
 
 
 3
 After suit was commenced, the parties reached a settlement on the merits in November, 1975. Getty Tankers agreed to pay 62.5% of the provable damages incurred by Chevron and Texaco from the loss of their cargo.[1] Additionally, Getty Tankers and Getty Oil agreed to pay United 62.5% of its provable damages. Herbert M. Lord was appointed special master to ascertain the damages sustained by Chevron, Texaco and United. The parties thereafter agreed on most of the damage calculations, with the exception of the two questions which constitute the issues on appeal.
 
 
 4
 The principal dispute centered on whether Chevron's and Texaco's damages included freight charges which they in fact paid to Overseas. Resolution of this issue, in turn, necessitated determination of another disputed question whether the Overseas/Chevron or Chevron/Texaco charters, or both, provided that freight would be earned irrevocably upon loading. If both, Chevron was legally obligated to pay Overseas for the carriage of the entire cargo, and Texaco was legally obligated to pay Chevron for the carriage of Texaco's share of the cargo. With regard to the third party appeal, the parties disagreed on whether United was entitled to include in the calculation of its damages profits lost on the voyage in progress at the time of Wafra's destruction.
 
 
 5
 The special master found against Chevron and Texaco, recommending to the district court that the freights be excluded from their damage computations. Without a hearing, the district court approved the special master's conclusions in a memorandum decision. Accordingly, it awarded Texaco and Chevron $463,736.94 (representing 62.5% of the invoice value of the cargo ($737,129.89), plus 62.5% of the fees of a salvage master ($4,849.23)), which did not take into account the freights paid. The district court also followed the special master's report on the third party claim, and awarded United $187,871.01 (representing 62.5% of $164,326.71 lost profits plus 62.5% of $136,266.96 out-of-pocket expenses).
 
 II. THE PRINCIPAL APPEAL
 
 6
 Chevron and Texaco urge that under the terms of both the Overseas/Chevron and the Chevron/Texaco oral charters the freights were earned and became nonreturnable once the cargo was loaded. That is, at the time of loading, Chevron was obligated to pay the freight charges to Overseas for the carriage of the entire cargo, whether or not the ship and its contents later arrived at the destination; similarly, Texaco was obligated to pay Chevron one-half of the freight charges. All parties agree that if the charters contained an earned prepaid freight provision,[2] the freights should be included in the computation of appellants' damages.[3] Conversely, in the absence of such an agreement freight is not earned until the cargo is delivered, and thus appellants' damages would not include freight. E. g., The Kimball, 70 U.S. (3 Wall.) 37, 44-45, 18 L.Ed. 50 (1865); Hellenic Lines, Ltd. v. United States, 512 F.2d 1196, 1203, 1209 (2d Cir. 1975); see The Nat Sutton, 62 F.2d 787, 790-91 (2d Cir. 1933).
 
 A. The Overseas/Chevron Charter
 
 7
 Appellant's chief contention before the special master was that the Overseas/Chevron agreement is governed by two prior, formally executed contracts still in force. Both contracts incorporated an earned-on-loading freight provision, thereby making the freight actually paid to Overseas ($316,667.52)[4] an element of Chevron's damages. A complete understanding of the relationship between these prior agreements and the Overseas/Chevron charter requires a brief genealogical review of Standard Oil of California (Standard Oil) and some of its affiliates.
 
 
 8
 Chevron, whose function is to market crude oil outside of the United States, is a Standard Oil affiliate. A Standard Oil subsidiary formerly named California Transport Corp., now named Chevron Transport Corp. (California), is a tanker company. Overseas is also a Standard Oil subsidiary and a tanker company. Both of these tanker companies are managed by Chevron Shipping, see note 4 supra, another Standard Oil subsidiary.
 
 
 9
 On April 1, 1959, Standard Oil and California executed a tanker transportation agreement (the 1959 contract) whereby the latter agreed to furnish tankers to Standard and its affiliates, including Chevron, for the transportation of petroleum cargoes.[5] On June 1, 1970, California and Overseas entered into a transportation contract (the 1970 contract). Under this agreement, Overseas contracted to provide vessels in performance of California's obligations to Standard Oil under the 1959 contract, on the terms and conditions specified in the 1959 agreement. Both contracts incorporated by reference the terms of Part II of the "Warshipoilvoy"[6] form of tanker voyage charter which oblige the charterer to pay freight irrevocably on loading, "ship and/or cargo lost or not lost."[7]
 
 
 10
 Appellants contend specifically that the Wafra was chartered by Overseas to Chevron, Standard Oil's affiliate, pursuant to the terms of the 1970 contract. They further assert that since the 1970 contract expressly incorporated the terms of the 1959 contract, and since the 1959 contract expressly incorporated the irrevocable freight-on-loading provision of the Warshipoilvoy form of charter, "it follows, as the night the day," Brief for Appellants at 21, that the oral Overseas/Chevron charter incorporated by reference the freight payment clause of the Warshipoilvoy charter.[8] Accordingly, the argument runs, Chevron was obligated to pay full freight to Overseas on the entire cargo at the time of loading, thereby entitling Overseas to retain the freight despite the loss of appellants' cargo.
 
 
 11
 In holding that there was no enforceable oral agreement requiring appellants to pay freight irrevocably to Overseas upon loading, the special master focused solely on the activities of Chevron and Texaco with respect to their oral charter. By the time of the Overseas/Chevron charter, Chevron and Texaco had negotiated draft transportation agreements dealing with destination sales, as the one involved here. See note 3 supra. However, the draft agreements had not been executed when the Wafra shipment was made.[9] These unexecuted contracts provided that freight was earned on loading. Appellants argued that the existence of these clauses in all of the drafts was an important indicator that the parties had agreed on freight irrevocably earned upon loading. The special master, however, concluded that an equally plausible inference from the fact that the documents were not executed was that at least one of the plaintiff-appellants (Texaco) was unwilling to assume this freight risk on the cargo shipments.[10] Chevron and Texaco disputed this interpretation. Their witnesses testified that the only point of disagreement related to the handling of backhauls and deadfreight,[11] and that both appellants believed they were operating under an earned freight provision. Nevertheless, the special master found that the "plaintiffs (had) not sustained (their) rather heavy burden of establishing that there was an enforceable oral agreement pertaining to the WAFRA shipments which committed them to pay freight irrevocably to Overseas."
 
 
 12
 The special master's report, however, does not refer to the 1959 agreement between Standard and California or to the 1970 agreement whereby Overseas agreed to furnish vessels to carry out California's obligations under the 1959 agreement with Standard Oil and its affiliates. Nor does the report at any point discuss the significance of the Warshipoilvoy charter form included in those agreements. It thus appears that the special master either did not consider the question whether the oral charter between Chevron and Overseas incorporated by reference the 1959 and 1970 agreements and their earned prepaid freight clauses, or, in addressing the question, erroneously failed to distinguish the different bases of the alleged respective obligations of Chevron and Texaco irrevocably to pay freight. Regardless of the terms of the separate transportation agreement between Chevron and Texaco, resolution of their mutual obligations is not determinative of the provisions contained in the Overseas/Chevron charter. For if the Overseas/Chevron charter included the Warshipoilvoy provision, then the freight charges on the entire shipment would be includable in Chevron's damages.[12]
 
 
 13
 We are thus left without any findings by the special master on this key mixed question of law and fact, other than his conclusion, based on an entirely separate contract, that appellants did not sustain their burden of proof. At the very least, we must require that specific findings be made on the terms of the Overseas/Chevron charter.
 
 
 14
 Similarly the district court did not distinguish the Overseas/Chevron charter from the Chevron/Texaco charter. In adopting the special master's report, the judge concluded that "(t)here was no explicit written agreement on the subject" of earned prepaid freight. Texaco Export, Inc. v. Overseas Tankship Corp., No. 72 Civ. 463, at 4-5 (S.D.N.Y., filed May 17, 1977). The district court further noted that "the actions of the parties were appropriately construed by the Special Master to have been inconsistent with any such oral agreement or with their prior dealings." Id. at 5.
 
 
 15
 The district court's conclusions are problematic for several reasons. First, it is clear that there were prior written agreements on the subject of earned prepaid freight with regard to the Overseas/Chevron charter. The issue is whether they were incorporated in the charter. Second, it is unclear what "actions" of Overseas and Chevron concerning their charter were "inconsistent" and how they were inconsistent. It appears from our reading of the evidence that the parties' conduct was compatible with their assertion that the Overseas/Chevron charter provided for irrevocable freight on loading. Mr. Macauley, vice-president of Chevron Shipping, the management company for California and Overseas, see note 4 supra, testified that the Wafra was chartered by Overseas to Chevron on the basis of the 1970 agreement which was executed to carry out, and incorporated, the 1959 agreement. He further testified that the billing to Chevron and Texaco for the freight was made pursuant to these earlier contracts. Moreover, the freight invoices submitted by Chevron Shipping state that they were "in accordance with transportation agreement." The evidence suggests that this reference was either to the 1970 agreement, as Mr. Macauley testified, or to the 1967 transportation agreement, both of which provided for irrevocable freight on loading. See notes 7 & 9 supra. Finally, Chevron's payment of its freight charge to Overseas without complaint or undue delay after the cargo was lost, without ever having taken steps to recover the payment from Overseas, bolsters the conclusion that the Overseas/Chevron agreement provided for prepaid freight.[13]
 
 
 16
 Our brief review of the evidence is not an attempt conclusively to find the facts surrounding the terms of the Overseas/Chevron charter ourselves. It does, however, support our suspicion that there was confusion below between the two distinct charters. Not even appellee Getty Tanker's brief satisfactorily meets the point that the terms of the Overseas/Chevron charter present a different issue from the terms of the Texaco/Chevron agreement.[14] In sum, we cannot agree, on the basis of the findings below, that the Overseas/Chevron charter did not include an irrevocable freight-on-loading provision. We therefore remand to the district court for findings on the subject, in view of appellants' contentions, which seem plausible and reasonable enough to warrant the most serious consideration.
 
 B. The Chevron/Texaco Charter
 
 17
 Given the omission below explicitly to distinguish between the two charters in issue, we believe that in the interests of justice, reconsideration of the terms of the Chevron/Texaco charter is also called for. Not unmindful of the great weight accorded to the findings of both the special master and the district court, we are persuaded that with a better understanding of the Overseas/Chevron arrangement as well as of the events which prompted Chevron to charter vessels for its oil sales to Caltex, the factfinder would view the evidence supporting the existence of an irrevocable freight-on-loading provision in the Chevron/Texaco charter in a different light.
 
 
 18
 If, as we suspect, and Chevron evidently believed,[15] the Overseas/Chevron agreement provided for freight earned on loading, it is verging on the inconceivable that Chevron, a "partner" with Texaco, see note 9 supra, would have entered into an agreement whereby Texaco would not assume a similar obligation. See note 10 & accompanying text supra. With the unlikelihood of this omission in mind, the factfinders below might well have been persuaded by the various witnesses who testified to appellants' interpretation of the contract. The nonexecution of the draft destination sales agreements, on which the special master and the district court so heavily relied, evidently "troubled" the master. But appellants certainly presented viable explanations to meet the special master's doubts. See notes 9-11 & accompanying text supra. Similarly, appellants presented a satisfactory explanation for Texaco's delay in paying Overseas its share of the earned prepaid freight, see note 13 & accompanying text supra, the only other reason articulated by the master in support of his conclusion that neither charter provided for earned freight on loading.
 
 
 19
 We therefore remand for reconsideration, with the aid of any additional insights this opinion may seem to present into the terms of the Overseas/Chevron charter, the question whether the Chevron/Texaco agreement provided for freight irrevocably earned on loading.
 
 III. THE THIRD PARTY APPEAL
 
 20
 The special master's report, adopted by the district court, allowed United's third party claim for lost profits[16] against Getty Oil, which had subchartered the vessel to United for five years (Getty Oil/United charter). The amount awarded is an estimate of the profits United would have reaped from the Wafra's aborted voyage (Voyage 3), had the vessel not been destroyed, based on United's profits from the first two voyages under its one-year charter with Overseas.
 
 
 21
 We agree with the special master and the district court that there is nothing speculative about the amount that United would have earned on this voyage.[17] Thus, the case falls within the definition of permissible recoveries enunciated in Polar Steamship Corp. v. Inland Overseas Steamship Corp., 136 F.2d 835, 840-41 (4th Cir.), cert. denied, 320 U.S. 774, 64 S.Ct. 83, 88 L.Ed. 464 (1943). See Putnam v. Lower, 236 F.2d 561, 571-72 (9th Cir. 1956); 11 S. Williston, A Treatise on the Law of Contracts §§ 1345-46A (W. Jaeger 3d ed. 1968). Getty Oil argues, however, that it was incorrect to utilize profits solely from the early portion of the five-year Getty Oil/United charter to measure damages. Rather, it asserts, the expected profits (or losses) to be sustained over the remaining four years and seven months of the charter also should have been included in the calculation; United, the assertion continues, having ignored the remaining period, failed to prove any lost profits.
 
 
 22
 The simple response to Getty Oil's argument is two-fold. First, there was evidence tending to show that United would have made profits over the remaining period of its charter with Getty Oil,[18] and though given the opportunity by the special master, Getty Oil failed to produce any contrary evidence. Second, by limiting its claim to profits lost on Voyage 3, United was under no legal obligation to establish that it would have continued to make profits during the remaining period of its charter with Getty Oil. Getty Oil had the burden of establishing that losses over this period would have diminished or eliminated the Voyage 3 profits. See L. Albert & Son v. Armstrong Rubber Co., 178 F.2d 182, 190-91 (2d Cir. 1949). Having failed to produce proof in this regard, Getty is foreclosed from claiming that the damages of United were too speculative or remote.
 
 
 23
 The cases relied on by Getty Oil do not support its position. In fact, The Umbria, 166 U.S. 404, 422-23, 17 S.Ct. 610, 41 L.Ed. 1053 (1897), held that damages occasioned by a vessel's destruction include, in addition to the value of the vessel, what the vessel would have earned on the voyage during which it was lost. Thus, it sustains the award to United. Skou v. United States, 478 F.2d 343, 346-47 (5th Cir. 1973), likewise does not fortify Getty Oil's argument. There the shipowner was precluded from recovering alleged profits lost while making collision repairs unless he could show that he had employment for the ship at the end of the collision voyage.[19] United, however, does not seek estimated profits from subsequent voyages. And it presented concrete evidence of the profits lost on the voyage in question.
 
 
 24
 Judgment on the principal appeal reversed and remanded for findings in accordance with this opinion; judgment on the third party appeal affirmed.
 
 VAN GRAAFEILAND, Circuit Judge, concurring:
 
 25
 Although I agree with the majority that this matter should be returned to the Special Master for further findings, I am unable to adopt much of Judge Oakes' broad opinion. I am especially unable to join in his "suspicion" that the Overseas/Chevron charter contained a freight earned provision. If we are sending this case back for further fact-finding, I believe we should let the Special Master do that free from our "additional insights". I also think that we would be better off to refrain from unnecessary speculation of the sort found in footnote 12, supra.
 
 
 26
 I concur in the result.
 
 
 
 [1]
 Under this agreement United and Overseas were not required to make any payment to Chevron or Texaco
 
 
 [2]
 Such irrevocable obligations to make payment are valid and binding. E. g., Alcoa S. S. Co. v. United States, 338 U.S. 421, 422 & n. 2, 70 S.Ct. 190, 94 L.Ed. 225 (1949); Hellenic Lines, Ltd. v. United States, 512 F.2d 1196, 1203 (2d Cir. 1975); Hirsch Lumber Co. v. Weyerhaeuser S. S. Co., 233 F.2d 791, 794 (2d Cir.), cert. denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956)
 
 
 [3]
 Poor, American Law of Charter Parties and Ocean Bills of Lading § 83 (5th ed. 1968); The Arctic Bird, 109 F. 167, 175 (N.D.Cal.1901); see St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral Commercial, 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201 (1923)
 The consignee of the cargo was Caltex South Africa (Caltex), a subsidiary of Caltex Petroleum Corp. (Caltex Petroleum). Title to the cargo was to remain in appellants until delivery to Caltex at Capetown. See notes 7 & 9 infra. Because appellants were the owners of the cargo at the time of the casualty, they are entitled to recover damages for its loss.
 
 
 [4]
 Chevron Shipping Co., Inc. (Chevron Shipping), a management company for both Overseas and California, prepared the invoices for freight as Overseas' agent. Instead of billing Chevron for the total amount due, Chevron and Texaco were each billed for half of these charges, and each subsequently paid their stated amounts. Chevron presented testimony of Robert Macauley, vice-president of Chevron Shipping, that although Chevron was liable for the full freight to Overseas, Texaco was directly billed for half of the charges in order to avoid rebilling by Chevron under the Chevron/Texaco charter
 
 
 [5]
 This agreement permits California to furnish vessels which it either owns or charters
 
 
 [6]
 The Warshipoilvoy form was developed by the War Shipping Administration in World War II. Part II of the Warshipoilvoy charter form, Paragraph 9, provides:
 FREIGHT. (a) Full freight to the discharging port named in Part I or declared by the Charterer in accordance with this Charter shall be completely earned on all cargo as loaded and the Owner shall be entitled to receive and retain such freight irrevocably under all circumstances whatsoever ship and/or cargo lost or not lost, whether or not the cargo is damaged or unsound, or in the event the voyage is abandoned or broken up.
 
 
 [7]
 The 1959 contract was explicitly made "pursuant to the terms and conditions of Part II of WARSHIPOILVOY (REV) form of tanker voyage charter party," a copy of which was "attached hereto and hereby made a part hereof." The original term of the 1959 contract was five years, but Standard and California continued to maintain it in force at least until the end of 1972, well after the operative facts here transpired
 The transportation contract of 1970 required Overseas to furnish tanker transportation to carry out California's obligations under the "Chevron Transport Corporation/Standard Oil Company of California" contract (apparently the 1959 contract) and under a similar transportation contract between California, as Standard Oil's nominee, and Caltex Petroleum (1967 transportation contract). See note 9 infra. The 1967 transportation contract also incorporated an irrevocable freight-on-loading provision. The 1959 and 1967 transportation contracts, "including the form of Tank Vessel Voyage Charter Party attached to and incorporated by reference therein," were incorporated by reference into the 1970 agreement.
 It is unclear whether the Overseas/Chevron charter was made to satisfy California's obligations under the 1959 contract or the 1967 transportation contract. In any event, since both of these agreements provided for irrevocable freight on loading, assuming that the Overseas/Chevron charter followed the dictates of the 1970 contract "to furnish . . . (a) vessel in accordance with the same terms and conditions (as in the 1959 contract or the 1967 contract)," it is immaterial which underlying transportation agreement was being satisfied by the Overseas/Chevron charter. In either case the oral Overseas/Chevron charter would likely include an irrevocable freight provision. See note 9 infra.
 
 
 [8]
 Not only are oral maritime contracts valid and enforceable, Kossick v. United Fruit Co., 365 U.S. 731, 734 & n. 4, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), but they may refer to and incorporate the terms of a written contract or other documents. See, e. g., Sun Oil Co. v. Dalzell Towing Co., 55 F.2d 63, 64-65 (2d Cir.), aff'd, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932)
 
 
 [9]
 Standard Oil and Texaco, Inc., the two parent companies of appellants, had previously formed a joint venture for the worldwide marketing of oil under the name of Caltex Petroleum Corp. The arrangement provided that Caltex South Africa would market the oil in South Africa. The Wafra shipment was one of many pursuant to the joint venture. From 1967 to 1970, sales of crude oil by Chevron and Texaco to Caltex Petroleum were on an FOB basis. Thus Caltex Petroleum took title to the oil at the loading port and arranged for its own transportation. A 1967 agreement between Texaco, Inc., and Standard Oil (1967 marine transportation agreement) specified that nominees of the signatories would provide the transportation under transportation contracts in the form annexed to the agreement. The annexed form incorporated the terms of the "Tank Vessel Voyage Charter Party form," which provides that freight is irrevocably earned on loading. Pursuant to this agreement, California contracted with Caltex Petroleum to provide transportation to specified countries. This 1967 California/Caltex Petroleum contract was referred to in the 1970 contract between California and Overseas. See note 7 supra
 In late 1970, Texaco, Inc., and Standard Oil decided that sales of crude oil to Caltex Petroleum should be made on a destination (CIF) basis. Since Caltex Petroleum and its nominees would not be taking title to the cargoes until they were delivered at destination, the 1967 marine transportation agreement and the 1967 transportation contract were evidently inapplicable because Caltex Petroleum would no longer need to charter vessels. It therefore became necessary for Chevron and Texaco, as owners of the cargoes, to arrange for transportation.
 Appellants assert that between November, 1970, and April, 1971, they chartered at least 60 vessels for destination sales to Caltex companies, and it was understood that these charters would incorporate the charter provisions, including the earned prepaid freight provisions, contained in the two 1967 agreements. They supported their contention by showing that whenever the crude oil was destined for a country to which California was obligated to provide transportation under the 1967 agreements, California continued to do so, as it did here. They explain that the vessel was provided to Chevron, however, rather than to Caltex, pursuant to the 1959 and 1970 agreements. Chevron in turn would then subcharter half the carrying capacity of the vessel to Texaco. Since, as appellants' witnesses testified, the parties intended to abide by the terms of the 1967 agreements, appellants assert that the oral subcharter to Texaco obviously incorporated an earned prepaid freight provision. The draft transportation agreements to cover the new destination sales program, which contained irrevocable freight provisions, were also introduced into evidence to support appellants' position.
 
 
 [10]
 The master noted that since appellants could not expect payment for the cargo until the shipments were delivered at their destination, it would not be unreasonable for Texaco to refuse to accept an irrevocable prepaid freight provision. We note, however, that Chevron and Texaco were, in effect, sharing the transportation costs and responsibilities. See note 9 supra. Thus, if the Overseas/Chevron contract provided for freight irrevocably earned upon loading, it is unlikely that Chevron would not insist on a similar arrangement with Texaco. See II, B infra. This is especially true since the Overseas/Chevron agreement was made prior to agreement between Chevron and Texaco
 
 
 [11]
 The special master was unconvinced by this explanation. He noted that "a deadlock on these issues would (not) have prevented the plaintiffs from signing an agreement covering the important question of when freight was earned." Furthermore, he observed that one of the draft agreements did not mention backhauls or deadfreight
 
 
 [12]
 Although Chevron was obligated to pay Overseas the full freight earned, Texaco paid one-half. See note 4 supra. It could be argued, therefore, that Chevron would be entitled to recover only the amount that it actually paid to Overseas. Because we also remand for additional findings on the terms of the Chevron/Texaco charter, see II, B infra, it is unnecessary to resolve the issue at this time. We note, however, that even assuming the correctness of the special master's and district court's conclusion that the Chevron/Texaco charter did not provide for irrevocable freight on loading, if the Overseas/Chevron charter contained such a provision, Chevron might be entitled to damages in excess of the amount it paid to Overseas. It would appear that under unjust enrichment principles Texaco would arguably be entitled to reimbursement from Chevron of the amount Texaco erroneously paid to Overseas. At this point, Chevron would be entitled to recover from Getty Tankers 62.5% of the full freight charge
 This, however, would not put Texaco and Chevron in the position that they would have been in had both the Overseas/Chevron and Chevron/Texaco charters been interpreted as they urge. For instead of Chevron and Texaco dividing equally the 37.5% reduction of their actual freight payments which they consented to sustain in the settlement agreement, Texaco would recover its full payment to Overseas (from Chevron) while Chevron would be required to absorb the full 37.5% loss. Whether Texaco would be required to equalize its recovery with that of Chevron by virtue of Texaco's agreement to the 37.5% reduction, or by virtue of general estoppel principles, we have no need to decide at this time.
 
 
 [13]
 The master noted that appellants' contentions were "hampered by the fact that the freight, if earned under the agreement, would have been payable by both plaintiffs in or about February 1971, when in fact Texaco did not pay until February 1974."
 Texaco explained that this delay was on the advice of counsel to pressure Chevron into resolving the controversy of backhauls and deadfreight associated with the Caltex Petroleum destination sales contracts. See note 9 & accompanying text supra. Though Texaco argues to the contrary, this late payment could properly be found to be inconsistent with the recognition of any obligation on the part of Texaco to pay freight irrevocably to Chevron. However, it sheds no light on Chevron's obligations under its oral contract with Overseas.
 
 
 [14]
 Getty Tankers' brief simply states that the special master's report and the district court "do not consider the alleged oral charter between Overseas and (Chevron) to be isolated or unrelated to the Fact that the drafts of the destination sales agreements . . . were unsigned." Brief of Appellee Getty Tankers Ltd. and Third Party Appellant Getty Oil Co. at 14. However, the unexecuted destination sales agreements, so far as we can determine, relate solely to the obligations between Texaco and Chevron and have nothing to do with the obligations imposed by the agreement between Overseas and Chevron. But see II, B infra
 
 
 [15]
 See note 13 & accompanying text supra
 
 
 [16]
 United was awarded $187,878.01. Part of this figure comprises out-of-pocket expenses which Getty Oil concedes it must refund to United. Brief of Appellee Getty Tankers Ltd. and Third Party Appellant Getty Oil Co. at 27. The controversy is over Getty Oil's responsibility to refund that portion of the award representing lost profits. United's out-of-pocket expenses totaled $136,266.96. Its gross revenues on the voyage in question would have been $398,811.62, with expenses of $234,484.91, leaving a net profit of $164,326.71. The $187,878.01 award represents 62.5% of the net profit figure of $164,326.71 (the amount in issue on this appeal) plus 62.5% of the out-of-pocket expenses of $136,266.96. We note that our calculations, like those of United, indicate damages of $187,871.04
 
 
 [17]
 The five-year Getty Oil/United time charter, dated April 7, 1970, provided for hire at the rate of $2.28 per dead weight ton per calendar month. The United/Overseas voyage charter of June 22, 1970, provided for as many consecutive voyages as the vessel could effect within a 12-month period, fixing the freight rate at "WORLDSCALE . . . 140" per ton, amounting to $5.894 per ton for the 32.3 day voyage during which the Wafra was destroyed. Based on the profits actually earned by United on the first two successful voyages by Overseas, if the Wafra had completed its third voyage, United would have made a profit of $164,326.71 or $5,087.52 per day. United's cost of operation was, as stated, $2.28 for charter hire under its time charter from Getty Oil and $.6033 per dead weight ton for expenses, including fuel consumption, brokerage, agency fee and lighterage dues. Thus, income in excess of $2.8833 per dead weight ton per month, which United would have received from Overseas, would have generated a profit
 
 
 [18]
 United presented evidence that based on its profits from the first two Overseas voyages and its estimated profits on the third voyage, it would have earned in excess of $1,150,000 (210 days times $5,490.88) over the remaining seven months of the charter party with Overseas
 With respect to the balance of the four-year period, there is some evidence that as of February, 1971, United could have subchartered the Wafra for the remaining four-year period to take effect at the end of the United/Overseas charter (sometime in October or November, 1971), at a profit. This conclusion is based on the fact that the current market freight rate for February, 1971, was well in excess of the total cost to United for its time charter. While this evidence might not be sufficiently certain to permit recovery of prospective lost profits extending beyond the third voyage, an issue we do not need to resolve, at the least it tends to support United's claim that it would not have suffered a loss during the balance of the Getty Oil/United charter.
 
 
 [19]
 Interestingly, after remand to the district court and a second trip to the court of appeals, it was held that the shipowner had met his burden of showing that he sustained a financial loss from the repair delay. Skou v. United States, 526 F.2d 293 (5th Cir. 1976)