TEXACO EXPORT, INC. and Chevron Oil Sales Co., Plaintiffs,

v.

OVERSEAS TANKSHIP CORP. and Getty Tankers Ltd., Defendants.

UNITED STEAMSHIP CORP., Defendant and Third-party Plaintiff,

v.

GETTY OIL CO., Third-party Defendant.

No. 72 Civ. 463 (ELP).

United States District Court,
S. D. New York.

March 28, 1979.

Healy & Baillie, New York City, for plaintiffs; Nicholas J. Healy, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants, Getty Tankers Ltd. and Getty Oil Co.; James M. Estabrook, New York City, of counsel.

## OPINION

PALMIERI, District Judge.

On February 12, 1971, the tanker *Wafra* left Ras Tanura, Saudi Arabia, bound for Capetown, South Africa, with a cargo of 472,513 barrels of crude oil. On February 28, the ship was stranded on a reef off the South African coast, and on March 12, South African authorities towed her away and sank her. The vessel and her entire cargo were lost.

After the plaintiffs sued in 1972 to recover damages for the loss of the cargo, a partial settlement was reached and an interlocutory judgment was entered on consent in November, 1975. Under the terms of the judgment, Getty Tankers Ltd. ("Getty"), the owner of the vessel, agreed to pay 62½% of plaintiffs' provable damages. The ascertainment of these damages was referred to a Special Master later designated by the court acting upon the suggestion of counsel.[1] The Special Master, Hon. Herbert M. Lord, found that although those damages included the F.O.B. price of the cargo, a matter which Getty did not contest, they did not include the ocean freight:

I have concluded that the plaintiffs have not sustained the rather heavy burden of establishing that there was an enforceable oral agreement pertaining to the WAFRA shipments which committed

them to pay freight irrevocably to Overseas. I therefore find on this record that Overseas had not earned freight on the WAFRA shipments prior to the casualty and that plaintiffs are not entitled to include such freight in their damage computation.[2]

In a memorandum opinion filed May 17, 1977, this court adopted the findings of the Special Master. *Texaco Export, Inc. v. Overseas Tankship Corp.*, No. 72 Civ. 463, slip op. at 5 (S.D.N.Y.).[3]

On an appeal taken by plaintiffs, the Court of Appeals reversed the holding that defendant Overseas Tankship Corp. ("Overseas") had not earned freight on loading of the *Wafra*'s cargo and remanded for additional findings of fact. 573 F.2d 717 (2d Cir. 1978).[4] The plaintiffs made contentions on their appeal to the effect that their oral charter arrangements incorporated the provisions of written contracts by which freight to the discharging port was earned on cargo as loaded. *Id.* at 720, 721. The remand for additional findings was made as a result of these contentions, which the Court of Appeals characterized as "plausible and reasonable enough to warrant the most serious consideration." *Id.* at 723. Mr. Lord was again appointed Special Master on March 10, 1978, for the purpose of making these additional findings.[5]

---

1. Counsel for plaintiffs wrote to the court on May 11, 1976:

   At the conclusion of the hearing in this matter on April 8, 1976, your Honor suggested that counsel try to agree upon a Special Master to be appointed to hear and report upon the issue of the inclusion of freight in plaintiffs' damages. . . . Counsel have agreed that Herbert Lord, Esq., of Messrs. Burlingham, Underwood & Lord be designated and Mr. Lord has agreed to accept if your Honor designates him. Counsel respectfully requests that your Honor do so.

   The court thereupon wrote to Mr. Lord on May 12, 1976, with copies to all counsel:

   I transmit herewith a copy of a letter dated May 11, 1976, which I have just received from Allan A. Baillie, Esq. [counsel for plaintiffs]. The parties in the above case have agreed that you be designated as Special Master to be appointed to hear and report upon the issue of the inclusion of freight in the plaintiffs' damages. I am pleased to act

   upon their recommendation and you may consider that you are hereby so designated.

2. Report of Special Master, filed May 18, 1977, at 8 (hereinafter cited as First Report).

3. Final judgment was entered on June 7, 1977.

4. The district court had also adopted the Special Master's finding on the third-party claim that the damages owing to defendant and third-party plaintiff United included lost profits which United would have earned had the voyage been successfully completed, and that third-party defendant Getty Oil had the burden of proving that such profits would have been dissipated in subsequent voyages under the charter agreement. This holding was affirmed by the Court of Appeals and is not before us on this remand. 573 F.2d at 725.

5. This court wrote to Mr. Lord on March 10, 1978:

Three of the four witnesses[6] who had testified at the 1976 hearings gave additional testimony, and new exhibits were received in evidence. No new witnesses were called by either party. Getty submitted no testimonial evidence at either the first or second set of hearings, and only one exhibit at the first hearing, unrelated to this matter. This is not surprising, since it can be fairly assumed that Getty had no evidence on the issue of plaintiffs' and Overseas' agreements, which allegedly formed the basis for the "freight earned on loading" provision of the oral charter asserted by plaintiffs.

The Special Master's second report[7] again found that Overseas had not earned freight on loading. Oral argument was heard by this court on February 22, 1979, on plaintiffs' motion to reject the report and to increase the amount of the judgment entered in their favor so as include the cost of the ocean freight, and defendants' cross-motion to adopt the report and to enter final judgment in accordance with this court's earlier judgment entered on June 7, 1977.

The crucial issue before us on this remand, therefore, is whether freight was irrevocably earned by Overseas when the cargo was loaded, so that the freight constituted part of the value of the lost cargo and thus part of plaintiffs' damages. 573 F.2d at 723. It is common ground that only if Overseas earned the freight on loading is it includable in the plaintiffs' damages.

We hold that the plaintiffs have not sustained their burden of proving that the freight was earned on loading. Therefore, the common-law rule that freight is not earned until delivery of the cargo must apply. *See* G. Gilmore & C. Black, The Law of Admiralty § 4–7, at 210 (2d ed. 1975); W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 28, at 77 (5th ed. 1968).[8] It follows that the freight is not an element of plaintiffs' damages and not recoverable as part of the loss incurred by the plaintiffs.

## I. Background

The *Wafra*'s cargo of crude oil had been consigned to Caltex South Africa, a subsidiary of California Texas Oil Corp. ("Caltex"), the stock of which is held by joint venturers Standard Oil of California ("Standard Oil") and Texaco, Inc., which are also the parent companies respectively of plaintiffs Chevron Oil Sales Co. ("Chevron") and Texaco Export, Inc. ("Texaco"). Under the terms of a 1970 preliminary agreement between Standard Oil and Texaco, Inc., sales of crude oil to Caltex in South Africa were to be on a "destination sales" (C.I.F.) basis, and title would not pass until delivery of the cargo at its destination. When the *Wafra*'s cargo was lost, therefore, title still remained in plaintiffs, each of which had an undivided half-interest in it.

Because of the plaintiffs' contention that in January, 1971, Overseas supplied the vessel under an oral charter to plaintiff Chev-

As you are aware the Court of Appeals in its decision of March 2, 1978 has remanded this case to me "with instructions to make, or to refer to the special master to make, specific factual findings on the terms of the two charters involved to determine whether appellants' damages include freight costs".
I would deeply appreciate it if you would accept the responsibility thus defined by the Court of Appeals.

6. The three witnesses who testified at both hearings were called by plaintiffs. They were Robert W. Macaulay, an officer of Chevron Shipping Corp., which was billing agent of Overseas, of which he was also an officer; R. L. Fraissinet, employed by Texaco, Inc., for many years in various capacities, and at the time of the second hearing, senior staff coordi-

nator, having familiarity with destination sales; and Robert O. Phillips, an attorney in the marine legal department of Texaco, Inc., responsible for matters affecting the marine department, and having familiarity with transportation agreements and the destination sales program. The witness who testified at the 1976 hearings and was not recalled in 1978 was also a plaintiffs' witness. He was Charles R. Cuddy, chartering supervisor of Texaco, Inc.

7. Report of Special Master, filed December 11, 1978 (hereinafter cited as Second Report).

8. *See also, e. g., Burn Line, Ltd. v. United States & A.S.S. Co.*, 162 F. 298, 299–300 (2d Cir. 1908).

ron, which allegedly, in turn, orally subchartered half her cargo space to plaintiff Texaco, it became necessary for the Special Master to consider evidence of the ownership and control of the *Wafra* herself at the time of her loss. This contention required the examination of several charter and subcharter agreements. The vessel's actual owner was defendant, Getty, which supplied her under a long-term time charter agreement dated October 1, 1961, to third-party defendant Getty Oil Co. ("Getty Oil"). On April 7, 1970, Getty Oil provided the vessel under five-year head charter to defendant (and third-party plaintiff) United, which supplied her under a twelve-month consecutive voyage charter, dated June 22, 1970, to defendant Overseas, a subsidiary of Standard Oil.

■ California Transport Corp. (since renamed Chevron Transport Corp.) ("California"), a tanker company, had agreed in writing on April 1, 1959, to supply oil tankers to Standard Oil and its affiliates, including Chevron. On May 1, 1967, California also agreed in writing to supply tankers to Caltex. In a written contract dated June 1, 1970, Overseas agreed to supply California with the tankers it needed to supply Standard Oil and Caltex under California's two earlier contracts. Both California's 1959 and 1967 agreements and Overseas' 1970 agreement with California expressly incorporated by reference [9] the terms of Part II of the "Warshipoilvoy" form of tanker voyage charter,[10] under which freight is fully

and "irrevocably" earned on loading, "ship and/or cargo lost or not lost."

The alleged agreement of charter between defendant Overseas and plaintiff Chevron, acting in effect on behalf of both itself and Texaco, was assertedly an oral one, as was the alleged agreement between the two plaintiffs themselves. The plaintiffs contend that Overseas' oral charter of the vessel to Chevron was governed by two earlier, written agreements, just described: California's agreement of April 1, 1959, to supply tankers to Standard Oil and its affiliates, and Overseas' agreement of June 1, 1970, to provide California with tankers to fulfill California's obligations to Standard Oil and Caltex. According to the plaintiffs, the *Wafra* was chartered pursuant to the terms of the 1970 agreement, which expressly incorporated the 1959 contract, including the freight-earned-on-loading term of the Warshipoilvoy charter form.

The evidence adduced at the hearings before the Special Master consists primarily of documents relating to draft and final transportation agreements between the plaintiffs' corporate parents, and between the plaintiffs themselves,[11] dealing with destination sales such as the one contemplated in this case, and providing that freight would be earned on loading; testimony relating to the plaintiffs' alleged agreement with Overseas; and evidence of actions of the parties, including Texaco's nonpayment of its share of the freight until 1974 and the parties' insurance arrangements.

---

**9.** Maritime contracts, oral or written, may validly incorporate by reference terms from other documents or agreements. *See, e. g., Tankers & Tramps Corp. v. Tugs Jane McAllister & Margaret M. McAllister*, 358 F.2d 896, 899 (2d Cir.), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); *Sun Oil Co. v. Dalzell Towing Co.*, 55 F.2d 63, 64–65 (2d Cir.), *aff'd*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932).

**10.** Part II, ¶ 9, of the Warshipoilvoy form provides in relevant part:

FREIGHT. (a) Full freight to the discharging port named in Part I or declared by the Charterer in accordance with this Charter shall be completely earned on all cargo as loaded and the Owner shall be entitled to receive and

retain such freight irrevocably under all circumstances whatsoever[,] ship and/or cargo lost or not lost, whether or not the cargo is damaged or unsound, or in the event the voyage is abandoned or broken up.

*See also Texaco Export, Inc. v. Overseas Tankship Corp.*, 573 F.2d 717, 720 n. 6 (2d Cir. 1978).

**11.** The nature of the arrangements between the plaintiffs has evidentiary value because, as the Court of Appeals noted, 573 F.2d at 721 n.10, Chevron would be likely to contract for Texaco's payment of its half of the freight on the same terms as those under which Chevron itself was liable to Overseas for the total.

*The Agreements Between the Plaintiffs' Corporate Parents*

From 1967 until November 1, 1970, Chevron and Texaco had sold crude oil to Caltex on an F.O.B. basis, with Caltex taking title to cargoes on loading, pursuant to a written agreement dated January 24, 1967, between the two corporate shareholders of Caltex. The 1967 agreement, like the 1959 agreement, made freight irrevocably earned on loading.[12] Beginning in October, 1970, however, representatives of Standard Oil, Texaco, Inc., and Caltex[13] began negotiating a new procedure involving destination sales, under which title would not pass until the cargo's delivery to Caltex at its destination, *i. e.*, sales would be on a C.I.F. basis.[14]

An internal Texaco memorandum of February 5, 1971, noted that transportation agreements "between the carriers and the trading companies" were called for and should have been prepared. On February 9, another internal Texaco memorandum in reply referred again to such agreements, stating that payment of freight invoices based on destination sales cargoes was authorized "[p]ending the completion of such Trading Agreements as may be appropriate between the respective tanker and supplier companies." Three days later, the *Wafra* sailed.

These transportation agreements between the plaintiffs' corporate parents were not executed until 1977. There is evidence that in the meantime, at least one of the corporate parents considered that no agreement existed making freight on the *Wafra* earned on loading. A representative of Texaco, Inc., indicated in August, 1971, that no agreement existed requiring Texaco to authorize payment of the freight invoices on the *Wafra*, and that payment could not be made until agreement was reached providing for "pre-earned and prepaid" freight.

## II. *Discussion*

Generally, the measure of damages recoverable from a carrier by the owner of lost cargo is the value the cargo would have commanded at its destination. *St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral Commercial do Rio de Janeiro*, 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201 (1923); *Holden v. S. S. Kendall Fish*, 395 F.2d 910, 912 (5th Cir. 1968); *Santiago v. Sea-Land Service, Inc.*, 366 F.Supp. 1309, 1314 (D.P.R.1973). The sound market value of the cargo is fixed by reference to the market at the time and place of its expected arrival. *The Arctic Bird*, 109 F. 167, 175 (N.D.Cal.1901). When market value cannot be proved, as it could not in the instant case for want of an established market for the crude oil in question at Capetown in early 1971, the value of the goods is presumed to be their value when loaded plus cost of carriage if carriage is prepaid. *Id.; The Hugo*, 61 F. 860 (S.D.N.Y.1894); *see* Poor, *supra*, § 29, at 81–82 & n.6; § 83, at 246 & nn.2, 5. There was no prepayment of freight here. But there is no dispute that the freight was in fact paid by both Chevron and Texaco after the loss. Chevron paid without undue delay, but Texaco withheld payment of its half of the freight until 1974. Although plaintiffs claim that Overseas was entitled under the oral Overseas/Chevron charter to bill Chevron for the full freight of $316,667.52, its agent actually billed Chevron and Texaco for half each. Both plaintiffs paid their shares of

---

12. While plaintiffs do not claim that the 1967 contract formed the basis for the charter of the *Wafra* in 1971, they do argue that that charter was based on the June 1, 1970 contract between California and Overseas, which incorporated by reference the 1967 agreement as well as the 1959 agreement between Standard Oil and Texaco, Inc.

13. Representatives of Chevron and Texaco apparently were not involved in these negotiations.

14. During the negotiations the parties discussed whether freight should be calculated "on quantities delivered rather than on quantities loaded." Letter from George M. Keller, Senior Director of Standard Oil and member of Board of Directors of Caltex, to J. W. Green, representative of Texaco, Inc., January 18, 1971. Texaco's counsel advised it in an internal communication, however, that it was standard practice to pay freight on quantities loaded, whether title passed then or later. This discussion did not address the question of when the carrier actually earned the freight.

the freight directly to Overseas. The parties agree that these payments can be included as damages as part of the value of the lost cargo only if they were paid pursuant to a legal obligation.

The Special Master rejected the plaintiffs' contention that the freight was withheld because of a dispute over backhauls and deadfreight between Texaco, Inc., and Standard Oil (the corporate parents), which was not settled until 1977.[15] Robert L. Fraissinet, senior staff coordinator of Texaco, Inc., testified for plaintiffs that at Standard Oil's request, Texaco, Inc., simply reconsidered the matter toward the end of 1973: "[W]e reviewed the matter internally within [Texaco, Inc.] with our legal department and with other departments involved, the marine department, and then concluded there was an agreement under which this transportation should be paid, although it had not been finally executed, and we proceeded to make the payment in, I believe, February of 1974."

The Special Master found this explanation unpersuasive. Not only did it come from an interested party, but other evidence indicated that Texaco, Inc., had acted on the assumption that no agreement existed obligating it to pay freight on the *Wafra*.[16] This aspect of the case received the close attention of the Special Master, and he reached the entirely justified conclusion that there was no persuasive evidence that the parties had acted pursuant to any legal obligation.

### The Alleged Agreement Between Overseas and Chevron for the Charter of the Wafra

The Special Master found that the terms on which Overseas, Chevron, and Texaco did business with respect to the chartering of the *Wafra* in 1971 were set not by them but by their corporate parents.[17] This necessitated an inquiry into the nature of the governing agreement between those corporate parents at the time of the *Wafra*'s loading and loss.

The plaintiffs argue that although the agreements between their corporate par-

---

**15.** Significantly, only the freight payment on the *Wafra* was fully withheld by Texaco, although its voyage was one of some 60 undertaken pursuant to the same arrangement between November 1970 and April 1971. There were disputes concerning deadfreight on other voyages, but in such cases, only the disputed amount was withheld.

**16.** The Special Master concluded:

A more likely explanation of Texaco's delay in payment, consistent with the documented position of its parent that no agreement had been reached about the freight being earned, is that the payment was finally made two years after this action was brought because Texaco then knew its recovery from Getty for freight was conditioned upon payment. Second Report at 13.

When Texaco paid the freight it had already received payment in full from the cargo underwriters, a Caltex affiliate, of the agreed insured value of the cargo, which was an amount roughly corresponding to the invoice price of the cargo plus freight. In order for the underwriters to have even a hope of securing reimbursement for the freight element, it was essential that Texaco treat the freight as irrevocably earned on loading, thereby enabling the underwriters to proceed by subrogation against Getty.

**17.** Second Report, Finding No. 1, at 18. Both plaintiff Chevron and defendant Overseas are subsidiaries of Standard Oil.

The plaintiffs object that the nature of the agreement between their corporate parents was "entirely irrelevant to the charter between Overseas and Chevron," and that therefore it was irrelevant whether Texaco, Inc., had agreed on whether freight would be earned at the date of the *Wafra*'s loading. This argument fails, however, if one accepts, as we do, the Special Master's finding that it was not the plaintiffs and Overseas, but Standard Oil and Texaco, Inc., which set the terms under which the plaintiffs and Overseas did business relating to the chartering of the *Wafra*.

Plaintiffs claim that the Special Master exceeded his mandate and violated applicable legal principles by disregarding the corporate entity and considering the interests of the corporate parents as well as those of their subsidiaries. *See American Renaissance Lines, Inc. v. Saxis Steamship Co.*, 502 F.2d 674, 677 (2d Cir. 1974). Here, however, while in some ways the various subsidiaries of Standard Oil and Texaco, Inc., are distinct from their parents, they appear to function principally as service arms of those parents. Since they exist primarily to serve their corporate parents and affiliates, an examination of the underlying interests of the parents was not amiss and, in fact, did not require a disregard of the corporate form.

ents were not formally executed until 1977, the unexecuted draft agreements providing that freight would be earned on loading indicated their intent to that effect.[18] Plaintiffs' explanation for the delay in execution was that their corporate parents simply had difficulty agreeing on treatment of backhauls and deadfreight, but that all other issues had been resolved long before. The Special Master has suggested, however, that the agreements may have remained unexecuted for so long, at least partly, because the issue of time of earning of freight remained unresolved—particularly in light of actions of Texaco which seem inconsistent with a belief that freight on the *Wafra* had been earned.

The plaintiffs' principal contention before us is that Chevron chartered the entire vessel from Overseas and then subchartered half her cargo space to Texaco. This was done, they assert, "pursuant to" the 1959 and 1970 agreements which made freight earned on loading.

By their terms, however, both these agreements apply only to charters of entire vessels from one Standard Oil subsidiary by another. They can have no application in a case where a vessel was chartered half by Chevron and half by a tanker subsidiary of another parent company. Thus, the question whether Chevron's alleged oral charter with Overseas was for the entire vessel or only half, and the corollary question as to whether a Chevron/Texaco part charter existed at all, were important subjects of inquiry by the Special Master.

It is clear that any oral understanding between Overseas and Chevron, pursuant to which the *Wafra* began her last voyage, was made pursuant to the destination sales policy which had recently been instituted by the corporate parents of Chevron, Overseas, and Texaco. The negotiations with respect to the policy provided no clear indication as to when freight would be deemed to be earned. The evidence on this issue is entirely oral or circumstantial. No agreement was ever reduced to writing. It appeared to the Special Master, as it does to us, that the very existence, let alone the precise terms, of the alleged oral charters between Overseas and Chevron and between Chevron and Texaco was impossible to determine from the available evidence.[19]

The Special Master expressed "considerable doubt" that the alleged agreement of charter was made by Overseas solely with Chevron rather than jointly with Chevron and Texaco.[20] In fact, Chevron never acknowledged any obligation to Overseas to

18. Plaintiffs point to the absence of any evidence that any of the parties ever suggested a change from the agreement, in effect prior to the beginning of destination sales, that freight was earned on loading. On March 9, 1971—after the *Wafra* was stranded but before she sank—Texaco, Inc., sent a Standard Oil subsidiary, California, a draft transportation agreement containing a freight-on-loading clause, with a covering letter stating that the draft was the result of a "preliminary legal review" and was subject to further review by Texaco, Inc.'s legal and tax departments before it could be executed. A Texaco, Inc., interoffice memorandum the next day, requesting such legal and tax review, noted that "freight is payable on loading . . . which is consistent with the terms of the [January 24, 1967] Marine Transportation Agreement between Texaco/Socal [i. e., Texaco, Inc., and Standard Oil] and Caltex." Plaintiffs argue that these documents show that even Texaco, Inc., did not object to the provision and that, since it was in both parties' drafts, they had agreed on it before the *Wafra*'s loading and loss, even though the formal agreements were not signed until years later.

But since the question as to when freight was payable was only part of a continuing dialogue between the corporate parents, directly or through Caltex, as to when the freight should be deemed earned, and as Texaco, Inc., following the loss, had questioned its liability for payment of the freight, the Special Master viewed the documents as indicating that the corporate parents had not yet agreed on when freight would be earned. Second Report at 11; *id.*, Finding No. 2, at 19.

19. Second Report, Finding No. 3, at 19.

20. Plaintiffs claim that the Special Master confused the Overseas/Chevron and Chevron/Texaco charters. It is evident, however, that the Special Master did not confuse the two charters but rather discussed them as thoroughly as possible, given his conclusions that it was impossible to tell what, if any, oral agreement existed at the time in question between Overseas and Chevron (*id.*, Finding No. 3, at 19) or between Chevron and Texaco (*id.* at 13–14).

pay the full amount of freight on the *Wafra*. It paid only half the total in 1971, and the rest remained unpaid until Texaco paid it in 1974.[21] Nothing appears in the record to indicate that Overseas ever looked to Chevron to make up the balance, even when Texaco withheld payment for three years. Notwithstanding plaintiffs' argument to the contrary, we are unable to construe Chevron's request to Overseas to bill Texaco rather than Chevron for the unpaid half of the freight as an acknowledgment of Chevron's obligation to pay that half.

The Special Master added:

It may be noted that even in the 1970 [California/Overseas] agreement, the terms of which Chevron seeks to incorporate into its oral charter, there was no straightforward obligation on [Chevron's] part to pay any more than its share of the freight.[22]

Since Texaco, Inc., had not yet agreed that freight was earned on loading, it is difficult to infer that Chevron alone could have so agreed, inasmuch as such an agreement would have exposed it to sole liability for freight without a corresponding obligation on Texaco's part. As there is nothing in the record to support the proposition that Chevron was willing to assume the entire freight risk, such an inference cannot be made.

The Special Master pointed out that for Chevron to shoulder the obligation to pay freight irrevocably on loading, "ship and/or cargo lost or not lost," would have been directly contrary to its own interest. Under the terms of the parent corporations' newly implemented destination sales policy,

title to a cargo did not pass—and thus Caltex did not have to pay for it—until it was delivered; yet risk of loss during the voyage would be borne by Chevron. In effect, Chevron would be acting as insurer of the freight for Caltex without compensation. Indeed, that is precisely the position in which Chevron now claims it voluntarily placed itself. Such an assertion requires better evidence to render it plausible than plaintiffs have offered here.

The fact that Chevron paid Overseas for its half of the freight without protest is not persuasive. Chevron recovered $531,890.00, including a freight element of $147,826.55, from the cargo underwriters, Eastern Hemisphere Insurance Ltd. ("EHIL"), a Caltex affiliate. Additionally, it was in the interest of Chevron's corporate parent, Standard Oil, to treat the freight as earned, since the tax and other financial consequences were more favorable to Standard Oil if its subsidiary Overseas earned the freight. While Chevron would "expense out" payment of the freight as an operating cost, Standard Oil paid no United States income taxes on freight earned by Overseas.[23] Overseas recorded the freight on its books as accrued when payable, even though—as was the case with Texaco's half—it may not actually have been paid until much later.

Plaintiffs contend that the Special Master was not free to "disagree" with the Court of Appeals' "finding" that Chevron's payment of freight to Overseas bolstered plaintiffs' case by indicating that Chevron believed it was obligated to pay. As the Special Master pointed out, however, it was to the financial benefit of Chevron's and

---

**21.** Mr. Macaulay testified in 1976 that the reason why Overseas' agent had billed each plaintiff directly was that the corporate parents had begun to implement their destination sales policy on November 1, 1970. Since as a result each plaintiff owned half of the *Wafra*'s cargo, each was billed for half the freight. This testimony, however, is not probative on the question of whether Chevron chartered the entire vessel and subchartered half to Texaco or whether each plaintiff chartered half the ship directly from Overseas.

**22.** Second Report at 14.

**23.** The plaintiffs conceded the validity of the Special Master's statement that under the Internal Revenue Code in effect until 1977, freight earned by Overseas was not subject to United States income tax. *Id.* at 16.

Although the plaintiffs challenge the Special Master's assertion that Standard Oil could gain by treating the freight as earned even if it was not, the evidence before him concerning corporate interrelationships and their financial and tax consequences, which he considered with great care, justifies such a conclusion. *Id.* at 15–16. We agree.

Overseas' corporate parent for Chevron to treat the freight as earned. New facts to this effect, brought out at the second hearings, considerably lessen the value of Chevron's payment as proof of the terms of its alleged oral charter with Overseas.

Similarly, plaintiffs contend that the Court of Appeals "held" that the Overseas/Chevron charter was based on the 1959 and 1970 written contracts. We believe that this assertion misconstrues the language of the Court of Appeals' opinion, which expressly disclaimed the making of any factual findings on the record before it. 573 F.2d at 723.

At the second set of hearings, the plaintiffs introduced evidence that at the request of Texaco, Inc., and Standard Oil, Caltex had insured the cargo on the *Wafra* with EHIL at a valuation consisting of invoice value plus freight, and that EHIL had paid the claim including the freight element. Overseas, on the other hand, never carried insurance against loss of freight and did not do so in the case of the *Wafra*. The Special Master's conclusion that Overseas had not earned the freight on loading, according to plaintiffs, disregards this evidence. We think not.

Overseas carried no insurance on the freight because it was not at risk for the hire under its head charter with United. Moreover, that there may have been a freight element in the EHIL cargo policies is not persuasive on the issue of whether an agreement had been reached that freight was earned on loading. The policies of insurance issued by EHIL provided as to vessels owned or chartered by the assureds that freight would be deemed to be fully paid and at cargo's risk. Accordingly, since the cargo was valued for insurance purposes in an amount equivalent to its cost plus freight, a loss would have been paid on that basis whether or not the freight was earned on shipment. We therefore consider that the Special Master was justified in disregarding the insuring arrangements as not being probative on the issue of whether the freight was earned on loading.

The Special Master's findings that the existence and terms of any Overseas/Chevron oral charter were impossible to ascertain [24] and that "[t]here was in February 1971 no agreement between Chevron and [Overseas] that the freight on the WAFRA shipments was earned irrevocably upon loading" [25] are sufficiently supported by the evidence and are adopted by this court.

■ The plaintiffs point out that the testimony of their witnesses was "uncontradicted," and claim that therefore the Special Master should not have rejected it. But in this case, the only party which would have been able to disprove plaintiffs' assertions was defendant Overseas, which under the terms of the settlement is not at risk even if plaintiffs win, and which additionally is a subsidiary of the same parent as is plaintiff Chevron. Getty, although it has committed itself to pay 62½% of the plaintiffs' provable damages, was not a party to any agreements among plaintiffs and Overseas. It could not have disproved their assertions as to the terms of those agreements. Moreover, the Special Master, like any other finder of facts, is permitted to reject inherently implausible testimony even if an opposing party is unable to produce evidence to contradict it. *See Chesapeake & Ohio Railway Co. v. Martin*, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931); *White Glove Building Maintenance, Inc. v. Brennan*, 518 F.2d 1271, 1273–74 (9th Cir. 1975); *Leather's Best, Inc. v. Tidewater Terminal, Inc.*, 346 F.Supp. 962, 965 (E.D.N.Y.1972). The Special Master properly discharged his responsibility, not only in ascertaining the truth, but in attributing to that truth as he found it the probative value which he believed it deserved.

### Alleged Part Charter Between Chevron and Texaco

The plaintiffs allege that Overseas chartered the entire vessel to Chevron and that Chevron chartered half her cargo space to

---

**24.** *Id.*, Finding No. 3, at 19.

**25.** *Id.*, Finding No. 4, at 20.

Texaco, so that the voyage was in effect a joint undertaking between the plaintiffs. Again, since the alleged agreement was never reduced to writing, no documentary evidence of it was introduced. If this charter had existed, its terms might reasonably be expected to have tracked those on which Chevron had chartered the entire ship from Overseas, 573 F.2d at 723, making the freight earned on loading. However, the Special Master's Second Report found that "[t]here was in February 1971 no agreement between Texaco and Chevron, or Texaco and [Overseas], that the freight on Texaco's cargo was earned irrevocably on loading." [26] He further found that whether freight on the *Wafra*'s cargo was earned on loading "was determined not by agreement between Chevron and [Overseas], or among Texaco, Chevron and [Overseas], but by agreement of [Texaco, Inc.] and [Standard Oil]." [27] The circumstance that plaintiffs' witnesses included no representatives of either Chevron or Texaco supports this conclusion. Thus, no testimony—or documentary evidence—was offered establishing the alleged oral agreement between them. According to all the evidence in the case, any agreement obligating Texaco to pay Chevron (or Overseas) half the total freight on the *Wafra* regardless of the loss of the cargo would necessarily have been made between the corporate parents.

Moreover, Chevron not only never paid more than its half of the freight but never acknowledged any obligation to pay the freight for the entire vessel. Nor did Overseas seek to charge it with any such obligation.

On this basis, the Special Master stated: I have considerable doubt about the testimony that the [Overseas] oral agreement, to the extent that one existed on February 12, 1971, was with Chevron for the whole ship . . . . It is difficult to accept without reservation testimony as to the terms of an oral agreement, such as the Chevron/[Overseas] Charter, which

in practice were not observed by its participants.[28]

This doubt is amply supported by the evidence, which tends to show that Chevron and Texaco each chartered half the vessel directly from Overseas—and that there was no charter of the entire ship to Chevron or a subcharter of half of it by Chevron to Texaco. Since it appears from this record that Chevron and Texaco each dealt directly with Overseas for half the vessel, the written contracts on which plaintiffs rely are inapplicable. As a result, there is a failure of proof as to the existence or terms of the oral charters on which plaintiffs ground their case.

### The Report of the Special Master Is Adopted in Full

Under Rule 53(e)(2) of the Federal Rules of Civil Procedure, this court must adopt the Special Master's findings of fact unless they are "clearly erroneous." All of his findings were supported by appropriate and probative evidence, and this court declines, as the plaintiffs suggest, to find them clearly erroneous. Additionally, this court declines to reject any part of the Special Master's report or to adopt the proposed findings or conclusions suggested by the plaintiffs.

### The Special Master's Fees

■ When the Special Master held the first hearings in this case in 1976, his fee was set at $5,000, payable half by plaintiffs and half by Getty. By reason of plaintiffs' appeal, however, he has not yet received that fee. We find that he should receive the initial $5,000, plus an additional $10,500 for his work on the renewed hearings and Second Report, with no separate charge for disbursements. His statement of 267.25 office hours of his own and others' time spent fulfilling his duties on this case amply justifies such an amount, and the parties agree that the total charges of $15,500 are reasonable for the time expended. We do not

---

**26.** *Id.*, Finding No. 5, at 20.

**27.** *Id.*, Finding No. 1, at 18.

**28.** *Id.* at 13–14.

agree with plaintiffs that the Special Master unduly extended the scope of his inquiry during the second set of hearings.

Payment of the initial $5,000 should be allocated as previously set. The additional sum is chargeable to plaintiffs.

Submit proposed judgment on notice.