**GLOMAC PLASTICS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**and**

**Amalgamated Clothing and Textile Workers Union, AFL–CIO, Intervenor.**

**Nos. 102, 443, Dockets 78–4046, 78–4058.**

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1978.

Decided Jan. 24, 1979.

---

Andrew H. Schwartz, Syracuse, N. Y. (MacKenzie, Smith, Lewis, Michell & Hughes, Kevin M. Reilly, Syracuse, N. Y., on the brief), for petitioner.

Joseph A. Oertel, Washington, D. C., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, Washington, D. C., for respondent.

Arthur M. Goldberg, New York City, George Kirschenbaum, Amalgamated Clothing & Textile Workers Union, AFL–CIO, New York City, George Kaufmann, Washington, D. C., for intervenor.

Before FEINBERG and MULLIGAN, Circuit Judges, and NEWMAN, District Judge.*

MULLIGAN, Circuit Judge:

Glomac Plastics, Inc. (the Company) has petitioned this court for review of a decision and order of the National Labor Relations Board (the Board) and the Board has made a cross-application for enforcement. The Board's decision and order issued on March 9, 1978 is reported at 234 N.L.R.B. No. 199. The Board found that the Company had bargained with the Amalgamated Clothing and Textile Workers Union of America, AFL–CIO–CLC (the Union) with the intention of avoiding agreement, in violation of Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the Act). The Board held that the finding of bad faith bargaining was supported by the Company's withdrawal of a maintenance-of-membership proposal, and by its refusal to provide the Union with requested information necessary for an intelligent understanding of a merit wage proposal under which the Company would have retained unreviewable control of wage increases.

The Union was certified as the bargaining agent for the production and maintenance employees of the Company on June 23, 1972 following a Board-conducted election. After numerous unsuccessful bargaining sessions the Union filed charges on April 25, 1973 and the Board issued a complaint on June 8, 1973 alleging a refusal to bargain and negotiation in bad faith from January 26, 1973.[1] After a hearing on the issues an administrative law judge upheld the refusal to bargain charges in a decision issued September 17, 1973. On March 9, 1978, four and one-half years after the decision of the administrative law judge, the Board issued its decision and order upholding the finding of refusal to bargain in good faith and extending the Union's initial certification year for another full year from the date the Company commences good faith bargaining. On this petition the Company contests the Board's decision on the merits as well as the propriety of its remedy. We withhold for 60 days the entry of judgment enforcing the order and remand the case to the Board for further consideration.[2]

---

* United States District Judge for the District of Connecticut, sitting by designation.

1. The Union had earlier filed an unfair labor practice charge containing similar allegations covering the period from August to November 1972. After an investigation, however, the Board's regional director on January 10, 1973 refused to issue a complaint. The dismissal of that charge was upheld by the Board's General Counsel on appeal.

2. The Company did not contest on this appeal the validity of the Board's decision and order respecting violations of section 8(a)(1) of the Act. As to those aspects of the Board's decision no remand is necessary and immediate enforcement of the provisions of the order respecting them is granted. Retail Clerks Union, Local 1401, AFL–CIO v. N. L. R. B., 149 U.S. App.D.C. 370, 374, 463 F.2d 316, 320 (1972).

## I  *The Facts*

During the initial certification year the parties held 15 bargaining sessions between August 9, 1972 and May 29, 1973. The ultimate areas of contention involved union security and wages. The Union on August 9, 1972 proposed a standard union security clause which required all employees to become and remain union members in good standing as a condition of employment subject to the sanction of dismissal and disqualification for further employment during the life of the agreement. It also proposed a method for payroll dues deductions. The Company made a counter offer, a voluntary maintenance-of-membership clause which required employees who were present members of the Union or those who thereafter became members, to maintain membership in good standing. In lieu of a dues check-off, the Company offered to provide a location where a union official might collect dues before or after working hours or during the noon hour.

The Union twice modified its initial proposals at sessions in September and October, 1972 but the Company adhered to its original position. Finally, on February 13, 1973 the Company suggested that there be no union security provision in the contract but that the Company would substitute a "letter of intent" providing for maintenance-of-membership. The Company then incorporated its original maintenance-of-membership proposal of August 9 in a letter of intent which was presented to the Union. The Union representative on March 30, 1973 voiced his own disagreement with the proposal but stated that he would present it to the membership for their decision as to its acceptability. However, on April 4, before the membership could be convened at a meeting to discuss the issue, the Company withdrew its proposed "letter of intent" as well as its initial maintenance-of-membership proposal and instead offered only to provide a place for a union officer to collect dues at the times initially indicated.

At the next bargaining session a federal mediator conferred separately with each party. The Union indicated that it would accept a 6% across the board increase coupled with the Company's initial maintenance-of-membership proposal. When this settlement was discussed by the mediator with the Company negotiators, the President of the Company became angry and belligerent, left the meeting without making a counter offer, and refused to reinstate its original maintenance-of-membership proposal.

The wage negotiations were equally unproductive. The Union presented its wage demands at a bargaining session on January 26, 1973 and sought the Company's proposal on this matter at two subsequent meetings. The Company, however, made no response until March 30 when it offered a five and one-half percent increase to be distributed on a merit basis. Under the proposal the recipients and amounts of the merit increases would be decided exclusively by the Company pursuant to a "point system" and the Company's merit raise decisions would be unreviewable. Despite repeated requests by the Union negotiators the Company refused to define for the Union any specifics as to how the unreviewable, company-run merit increase system would operate.

The Union unanimously rejected the Company's wage offer on April 8 and the following week asked for a 6% across the board wage increase. The Company refused the demand and also refused to submit the issues to binding arbitration. Thereafter the Union conducted one-day strikes on April 23, May 1, and May 7. Despite the further intervention of the federal mediator, the Company made no other counter offers. Negotiations ended on May 29.

## II  *The Merits*

The statutory duty to bargain in good faith does not mandate that an employer submit to every union demand or forego shrewd or tough bargaining positions. *N. L. R. B. v. American National Insurance Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). It simply requires that the parties to the negotiations demonstrate a " 'serious intent to adjust differences and to reach an acceptable com-

mon ground.'" *Continental Insurance Co. v. N. L. R. B.*, 495 F.2d 44, 48 (2d Cir. 1974). Conduct tantamount to a refusal to negotiate in fact constitutes a *per se* violation of the duty to bargain in good faith. *N. L. R. B. v. Katz*, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Far more often, however, as in the instant case the Board finds no conduct which on its face is violative of section 8(a)(5). The Board must then evaluate the totality of a party's conduct to establish whether negotiations were merely a charade concealing a desire to frustrate agreement. *Continental Insurance Co. v. N. L. R. B., supra.* In arriving at this determination the Board may rely on surrounding events and comments as indicia of the subjective intent motivating conduct at the bargaining table. *N. L. R. B. v. Patent Trader, Inc.*, 415 F.2d 190, 197 (2d Cir. 1969), aff'd as modified, 426 F.2d 791 (1970) (en banc). Moreover, we will not lightly disregard the Board's expertise in assessing whether the party's conduct evidences a sincere desire to reach agreement. *N. L. R. B. v. Insurance Agents' International Union, AFL–CIO*, 361 U.S. 477, 498–99, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. N. L. R. B.*, 147 U.S.App.D.C. 289, 296–97, 455 F.2d 1357, 1364–65 (1971). On this appeal our function is to determine only whether substantial evidence on the record as a whole supports the Board's conclusion that the Company was intent upon avoiding an agreement with the Union. E. g., *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *N. L. R. B. v. Windham Community Memorial Hospital*, 577 F.2d 805, 809 (2d Cir. 1978). We hold that there is such evidence.

■ As the administrative law judge found, the Company's rejection of a union security clause and its insistence instead on a maintenance-of-membership proposal was lawful so long as the Company's position on this issue was not taken in order to thwart agreement. *Caroline Farms Division of Textron, Inc. v. N. L. R. B.*, 401 F.2d 205, 210–11 (4th Cir. 1968). The subsequent withdrawal by the Company of the maintenance-of-membership offer and the refusal to reinstate that proposal did not constitute a *per se* violation of section 8(a)(5) since the parties had agreed at the outset of negotiations that tentative agreements on specific issues were not to be considered binding until accord had been reached on the entire bargaining agreement. In the circumstances of this case, however, the withdrawal could properly have been viewed as evidencing the Company's bad faith. See, e. g., *Texas Coca-Cola Bottling Co.*, 146 N.L.R.B. 420, 430 (1964), enf'd, 365 F.2d 321 (5th Cir. 1966).

■ It has been held that "[p]atently improbable justifications for a bargaining position will support an inference that the position is not being maintained in good faith." *Queen Mary Restaurants Corp. v. N. L. R. B.*, 560 F.2d 403, 409 (9th Cir. 1977); see also *N. L. R. B. v. Milco, Inc.*, 388 F.2d 133, 138–39 (2d Cir. 1968). Here the Company advanced highly implausible grounds for the withdrawal of the maintenance-of-membership proposal. At the hearing, Company president MacKessy testified that he withdrew the offer due to his good faith doubt that the Union continued to command the loyalty of a majority of its employees.[3] MacKessy claimed that his doubt as to continuing majority status rested largely on the lack of employee support for three strikes called by the Union during the bargaining negotiations. But in fact those strikes occurred several weeks *after*

---

**3.** Absent special circumstances, during the year following certification a union enjoys an irrebuttable presumption of majority status and consequently an employer is not free to discontinue negotiations during this period based on doubts as to whether the union represents a majority of employees. *Brooks v. N. L. R. B.*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

However, it is reasonable during the certification year for an employer to refuse contract provisions which would tie employees in the future to a union if the employer harbors good faith doubts as to the union's continuing majority status. See *Furr's Cafeteria*, 179 N.L.R.B. 240 (1969); *S & L Co. of Billings*, 159 N.L.R.B. 903 (1966).

the Company withdrew the maintenance-of-membership proposal.[4]

MacKessy further attempted to justify the withdrawal by asserting that the Company "just can't fire people because they don't want to join the union under any circumstances." The proposal in issue, however, did not mandate union membership; it simply required those who were currently members of the Union or who thereafter joined the Union to maintain their membership as a condition of employment during the term of the agreement. Thus, only those employees who voluntarily joined the Union were affected. Since the proposal did not require the Company to fire those who had no desire to join the Union, this purported rationale for the precipitate withdrawal of the offer some eight months after it had been proposed also seems pretextual.

Indeed, the logical contradictions in MacKessy's explanation for the withdrawal of the proposal coupled with the general impression conveyed by his demeanor on the witness stand, permitted the administrative law judge to find—as she did—not only that MacKessy's testimony was false, " 'but that the truth is the opposite of his story.' " *N. L. R. B. v. Walton Manufacturing Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962). She was therefore justified in concluding that the withdrawal of the maintenance-of-membership clause was designed to prevent consummation of agreement between the parties prior to the end of the certification year.

█ Other evidence buttresses this conclusion as to the actual motivation underlying the Company's withdrawal of the proposal. In November, 1972, five months into the certification year, MacKessy told a union negotiator: "it is impossible for a plant to operate with a union." In April, 1973 the Company plant manager said to union representatives: "you do not have a union and we do not recognize a union." Such antecedent communications were properly relied upon by the Board as coloring subsequent actions taken by the Company at the bargaining table. See *N. L. R. B. v. General Electric Co.*, 418 F.2d 736, 761 (2d Cir. 1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970); *N. L. R. B. v. Patent Trader, Inc., supra,* 415 F.2d at 197.

█ The repeated refusals to supply information to the Union concerning the proposed merit increase wage plan are further illustrative of the Company's bad faith negotiations. The Union was entitled to information necessary for an intelligent understanding and evaluation of the merit raise proposal. *N. L. R. B. v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); see *N. L. R. B. v. General Electric Co., supra,* 418 F.2d at 757. Certainly it was reasonable for the Union to request specifics concerning the criteria the Company intended to employ in awarding merit increases. See *ITT, Corp. v. N. L. R. B.*, 382 F.2d 366, 372 (3d Cir. 1967), cert. denied, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829 (1968). Moreover, we reject the Company's contention that the request for this information was premature. According to the terms of the Company's merit increase proposal, raises thereunder were due in the very month that the issue arose in the bargaining sessions. Hence, the Company's refusal to provide this information was susceptible of the inference of bad faith negotiating which the Board attributed to it.

In sum, our examination of the entire record reveals substantial evidence to support the Board's finding that the Company violated section 8(a)(5) of the Act.

### III  *The Remedy*

The Union was certified on June 23, 1972 and, as discussed above, bargaining between the parties ensued. The Board accepted the finding of the administrative law judge that while the first "hard evidence" of bad faith negotiation by the Company

---

**4.** The withdrawal occurred on April 4. The strikes took place on April 23, May 1, and May 7.

was its withdrawal of the maintenance-of-membership proposal on April 4, 1973, the evidence suggested that the Company's bad faith bargaining may have commenced "much earlier." Citing the adverse impact of bad faith bargaining within the certification year as well as "realities of collective bargaining negotiations," the Board then adopted the remedial recommendation of the administrative law judge and ordered that the certification year be renewed in its entirety from the date the Company commences to bargain in good faith. The Company challenges this remedial provision on two grounds, asserting both that under the circumstances of this case extension of certification for a full year is improper and, more fundamentally, that this court should order a new election rather than a resumption of bargaining.

At the outset, however, the Company urges that in determining the appropriate remedy in this case we should take into consideration several events which allegedly transpired after the decision of the administrative law judge was handed down. The Company contends that following the issuance of that opinion in October, 1973 the Company bargained in good faith with the Union for eight months until June, 1974. The Company further asserts that in the interim between the ruling of the administrative law judge and that of the Board there was almost complete turnover in the bargaining unit and that for the past three and one-half years the Union has totally abandoned the employees.

■ However, pertinent these factors may be to the issue before us we cannot now consider them. The Act provides that this court can review only those factual matters raised before the Board and made part of the record on appeal. See 29 U.S.C. § 160(e). As the Company concedes, these matters were not presented to the Board nor are they part of the record before us. Moreover, the Company has made no motion to reopen the record for the purpose of adducing this evidence. 29 U.S.C. § 160(e); 29 C.F.R. § 102.48(d)(1). Consequently, we cannot examine these factual contentions at this stage of the proceedings. See *Glaziers' Local No. 558, AFL–CIO v. N. L. R. B.*, 132 U.S.App.D.C. 394, 399–400, 408 F.2d 197, 202–03 (1969). See also *N. L. R. B. v. Coca-Cola Bottling Co.*, 472 F.2d 140 (9th Cir. 1972).

■ Concerning the propriety of the remedy itself the Company first argues that in view of the nine and one-half months of bargaining which preceded the actions found to demonstrate the Company's bad faith the renewal by the Board of the *entire* certification year was improper. The Company acknowledges that the Union must be allowed one full year of good faith bargaining following its certification. E. g., *Brooks v. N. L. R. B.*, *supra*. But the Company protests that the remedy in the instant case will have the effect of compelling such bargaining for a total of over 21 months, nearly double the "reasonable period" for bargaining during which employers are ordinarily required to negotiate with the union. Thus the Company urges that if this court approves a bargaining order the certification year should be extended by only two and one-half months. We disagree.

" 'It is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged.' " *Franks Brothers Co. v. N. L. R. B.*, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944). We will disturb a remedial order only where it amounts to "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. N. L. R. B.*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). There is ample precedent for the Board's authority to renew a certification year in its entirety, e. g., *Cocker Saw Co. v. N. L. R. B.*, 446 F.2d 870, 872 (2d Cir. 1971); *Big Three Industries, Inc.*, 201 N.L.R.B. 700, 713 (1973), enf'd, 497 F.2d 43 (5th Cir. 1974), as well as to extend required bargaining for lesser periods. E. g., *General Electric Co. v. N. L. R. B.*, 400 F.2d 713, 729–30 (5th Cir. 1968), cert. denied, 394 U.S. 904, 89 S.Ct. 1012, 22 L.Ed.2d 216 (1969).

The real argument of the Company, however, is that the cases in which the remedy included an entire new certification year involved only a relatively short period of good faith bargaining initially so that negotiations had never really gotten underway. See, e. g., *Cocker Saw Co.*, 186 N.L.R.B. 893, 896 (1970), enf'd, 446 F.2d 870 (2d Cir. 1971). While this may well be characteristic of the cases in which a full certification year is usually ordered, there are other factors in the instant case which lend support to the Board's decision to invoke that remedy here. Although the first "hard evidence" of bad faith bargaining occurred after nine and one-half months of negotiation, nearly six months before the April withdrawal of the maintenance-of-membership proposal MacKessy had stated to the union negotiator that "it's impossible for a plant to operate with a union." Thus, as the administrative law judge noted, bad faith bargaining "may have commenced far earlier." Indeed, the Board observed that bad faith "can rarely be said to start at a particular point." The Board also commented in this connection on the historical inability of the Company to reach accord with unions representing its employees. Furthermore, crediting the Company with nine and one-half months of bargaining in this case could actually benefit the Company for its disruption of good faith negotiation since it is unrealistic to think that these two parties could resume bargaining at the same stage at which negotiations broke off over six years ago. See *Cocker Saw Co. v. N. L. R. B., supra*, 446 F.2d at 872–73. On the contrary, it seems most unlikely that fruitful negotiations could now occur during a mere two and one-half months of bargaining.

We recognize that renewal of the full bargaining year is in some respects undesirable since it involves the possibility that an unwanted bargaining representative will be imposed for a time upon the unit employees. *General Electric Co. v. N. L. R. B,* *supra,* 400 F.2d at 730. In view of the unfortunate and substantial delay in this case, however, every remedial solution will have its disadvantages. And as we discuss at greater length below, relief will not be unavailable for dissatisfied employees, who will retain their statutory right to petition for decertification. 29 U.S.C. § 159(c).

Under all these circumstances we simply cannot find that the renewal of the entire bargaining year is an abuse of the broad discretion afforded the Board in fashioning an appropriate remedy. See *Fibreboard Paper Products Corp. v. N. L. R. B.*, 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

■ Finally, the Company contests the propriety of enforcement of any bargaining order at this stage of the case. The Company urges that the passage of time alone, here almost six years between certification and the Board's decision, calls into question the continuing reliability of the election upon which certification was based. While admitting that a Board remedy should not reward employer misconduct, the Company insists that especially in view of the rather extraordinary delay prior to the Board's resolution of this case, the right of the employees freely to choose their bargaining representative should now be of paramount importance in fashioning a fair remedy. Cf. *N. L. R. B. v. Flomatic Corp.*, 347 F.2d 74, 78 (2d Cir. 1965). Accordingly, the Company asks that we decline to enforce the bargaining order and instead remand this case to the Board so that it may order a new election.

At first blush the Company's position has considerable appeal in view of the fact that most of the delay in this case, some four and one-half years, is attributable to unexplained inaction by the Board.[5] Our course, however, is mandated by Judge Feinberg's opinion for this court siting en banc in *N. L. R. B. v. Patent Trader, Inc.*, 426 F.2d 791

---

5. One possible justification for at least part of the Board's delay is that two Supreme Court decisions issued in February, 1975 were pertinent to the section 8(a)(1) violations which have not been contested on this appeal. How-ever, these Supreme Court opinions were handed down over three years before the Board finally ruled in the instant case in March of 1978.

(2d Cir. 1970). There we held "it is error to refuse to enforce a bargaining order when it is conceded that there has been a Board election, the Union was duly certified, and the Company thereafter refused to bargain in good faith." *Id.* at 792. Not unlike the case at bar, in *Patent Trader* nearly four years had elapsed from the initial election to the panel decision. Moreover, nearly three years had transpired since the employees had held a second election repudiating the union as the unit's bargaining representative. Yet the ruling of the panel demanding a new election rather than a bargaining order was unanimously rejected on rehearing en banc. We were, of course, aware in *Patent Trader* that enforcement of the bargaining order might have the practical effect of forcing the employees to be represented temporarily by an undesired union. However, we were persuaded that "[r]equiring still another Board election in such a situation undermines the central purpose of the National Labor Relations Act, since it gives an employer an incentive to disregard its duty to bargain in the hope that over a period of time a union will lose its majority status." *Id.* We therefore adopted Judge Feinberg's view, expressed in the earlier panel decision, that "while seeming to protect employee rights" the requirement of a second election "will in the long run serve to erode them." 415

F.2d at 204 (Feinberg, J., dissenting in part); see *Ex-Cell-O Corp. v. N. L. R. B.*, 145 U.S.App.D.C. 396, 401, 449 F.2d 1058, 1063 (1971).[6]

We continue to believe that the rationale of *Patent Trader* is sound and that it is, for the most part, dispositive of the Company's position. Furthermore, as in *Patent Trader*, we expect that any temporary imposition on employees' rights arising from enforcement of the bargaining order at this time will be ameliorated to some extent by the Board's notification to the unit employees of their right to petition for decertification. 426 F.2d at 793; *Ex-Cell-O Corp. v. N. L. R. B., supra*; *N. L. R. B. v. Staub Cleaners, Inc.*, 418 F.2d 1086, 1089–90 (2d Cir. 1969), cert. denied, 397 U.S. 1038, 90 S.Ct. 1357, 25 L.Ed.2d 649 (1970).

While we feel bound to enforce the Board's order under the rule of *Patent Trader*, we are greatly troubled by the egregious delay in this case and by the fact that the Board's failure to render its decision with reasonable celerity is largely responsible for that delay.[7] In view of these considerations, even though we cannot take cognizance of the alleged changes in the bargaining posture of the Company, the claimed employee turnover or the abandonment of the unit by the Union, we believe it is only fair to all concerned that the Board should

---

**6.** To support the position that a new election should be ordered here the Company cites a number of cases decided under *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). *Gissel* directed that the propriety of a bargaining order be tested by examining whether the "employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority." *Id.* at 594, 89 S.Ct. at 1930. The *Gissel* line of precedent, however, is inapposite. *Patent Trader, supra*, 426 F.2d at 792. This is not a case in which an employee prevailed in an election permeated by unfair labor practices; nor is it an authorization card case where that method alone had been the basis for representation of the employees by the union. Unlike *Gissel* and its progeny, in the instant case the Company is being ordered to bargain because of the violation of its statutory duty to bargain with the duly elected bargaining representative of the unit.

In certain other cases on which the Company relies a new election rather than a bargaining order was required even though the Union had previously won an election. E. g., *N. L. R. B. v. Anvil Products, Inc.*, 496 F.2d 94, 97 (5th Cir. 1974); *Fremont Newspapers, Inc. v. N. L. R. B.*, 436 F.2d 665, 673 (8th Cir. 1970). But those cases involved wrongful refusals to bargain with the union *after* the end of the certification year, when the union no longer enjoyed its irrebuttable presumption of majority status, not during that one year period of statutorily mandated recognition. While we believe these latter cases to be importantly distinct from the situation at bar, to the extent they could be construed as inconsistent with *Patent Trader* we are not free to follow them in any event.

**7.** Unfortunately, lengthy Board delay is not unusual, nor is it a problem of recent vintage. See then Chief Judge Lumbard's dissenting opinion in *N. L. R. B. v. Staub Cleaners, Inc., supra*, 418 F.2d at 1090–92.

have the opportunity to reconsider whether entry of a bargaining order now remains appropriate. *NLRB v. H. P. Hood, Inc.*, 496 F.2d 515, 520 (1st Cir. 1974).

We therefore withhold for sixty days entry of judgment enforcing the Board's bargaining order and remand the case to the Board for such further consideration and any revision of the remedy as it deems advisable. *Id.* The Board should inform this court within that time whether or not in its view a judgment enforcing the terms of the present order should be entered.