NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CUTTING, INC., Respondent.

No. 81–2204.

United States Court of Appeals,
Seventh Circuit.

Argued May 6, 1982.

Decided March 2, 1983.

Susan Williams and Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

John T. Neighbours, Indianapolis, Ind., for respondent.

Before WOOD and ESCHBACH, Circuit Judges, and LARSON, Senior District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

This case is before us upon application of the National Labor Relations Board (the "Board") for enforcement of its decision and order against Cutting, Inc. ("Cutting" or the "Company")[1]. The Board adopted the findings of the Administrative Law Judge ("ALJ") that Cutting violated section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) (1976), by threatening to close the Hartford plants, by engaging in repeated coercive interrogation of employees about union activities, by engaging in unlawful surveillance of peaceful picketing, by threatening employees with legal proceedings for lawfully striking and

---

[*] The Honorable Earl R. Larson, Senior District Judge of the District of Minnesota, is sitting by designation.

[1] The Board's decision is reported at 255 N.L.R.B. No. 76 (1981).

picketing, and by threatening to discharge the local union president because of his union activities. The Board also adopted the ALJ's findings that the Company violated sections 8(a)(1) and 8(a)(3) of the Act by assigning employees Pamela O'Connell and Frances Griffey more arduous job tasks because of their union support, by discriminatorily suspending them from work for three days, by issuing O'Connell an unwarranted written disciplinary warning, and by refusing to reinstate O'Connell, Griffey, and other former striking employees after they unconditionally offered to return to work. Finally, the Board agreed with the ALJ that the Company had not violated the Act in discharging employee Rick Hodge but disagreed with the ALJ's conclusion that there was no section 8(a)(1) violation arising from the Company's solicitation of employee grievances prior to the union election.

The Board adopted the ALJ's recommended order requiring Cutting to cease and desist from engaging in the kinds of unlawful conduct with which it was charged, to reinstate O'Connell, and to pay lost compensation to all former strikers who were not immediately reinstated when they unconditionally offered to return to work. After finding the Company had committed "multiple and flagrant" violations, the Board also added a provision generally requiring Cutting to cease and desist from "in any other manner" interfering with, restraining or coercing employees in the exercise of rights guaranteed under section 7 of the Act.

Cutting does not dispute the findings of the Board other than those relating to its failure to reinstate O'Connell and the other former economic strikers when they unconditionally offered to return to work. The Company states it is willing to comply with all orders of the Board except those which are the result of its refusal to reinstate the strikers and the provision requiring it to cease and desist from "in any other manner" interfering with, restraining, or coercing employees in the exercise of their sec-

tion 7 rights. Consequently, the only issues before this court are: (1) whether the Board's finding of unlawful refusal to reinstate former economic strikers is supported by substantial evidence on the record considered as a whole, (2) whether it was a denial of procedural due process for the Board to rule on the refusal to reinstate employees other than O'Connell when the Board's complaint only alleged that the refusal to reinstate O'Connell was unlawful, (3) whether the Board improperly expanded the scope of the ALJ's recommended order by requiring Cutting to cease and desist from "in any other manner" interfering with, restraining, or coercing employees in the exercise of rights guaranteed under section 7 of the Act.

## I. RELEVANT FACTS

Cutting operates two plants in Hartford City, Indiana, which produce paper rolls for business machines. In June of 1979, the United Paperworkers International Union (the "Union") was certified as the collective bargaining representative for the production and maintenance employees at both Hartford City plants. After several months of unsuccessful negotiations for its first agreement, the Union called for an economic strike to begin Thursday, October 11.[2] On that day, the Company began advertising for permanent replacements in the local newspaper.

Monday morning, October 15, Cutting's Plant Manager, Clyde Griffith, was observed speaking with a reporter from the Hartford City News Times. Griffith told the reporter that if the striking employees did not return to work they would be permanently replaced. That afternoon the newspaper carried an article which purported to quote Griffith as saying the strikers "will be permanently replaced tomorrow if they don't report to work." Strikers who read the article believed they had until Tuesday, October 16 to return to work. Consequently, at about 7:00 p.m. Monday evening, Union President David Lillard

---

**2.** All dates refer to 1979 unless noted otherwise.

phoned Griffith to tell him the strike was over and the employees would be returning to work. Griffith replied it was too late because permanent replacements had already been hired. The former strikers nevertheless reported for work at 7:00 a.m. the next morning. Again they were told they were too late because they had been permanently replaced. None of the replacements actually began work until Wednesday, October 17.

The evening of October 16 or 17, Griffith called Lillard to offer the former strikers work on a new midnight shift at Plant 1 beginning Sunday, October 21. Lillard checked with the other employees and found all would accept work on the third shift except for O'Connell who advised she could not obtain care for her four children at that time because her husband worked swing shift at another company. Lillard reported back to Griffith that everyone would be returning except O'Connell. When Griffith asked Lillard if he knew why O'Connell was not returning, Lillard replied: "Yes, I think she's going to stay home and be a housewife." On the basis of that conversation, Griffith instructed Personnel Assistant Zella Taylor to complete a Company termination form for O'Connell which stated: "Per David Lillard ... Pam will not be returning. She intends to stay home and as of 10/18/79 be a housewife."

On October 21, all the former strikers except O'Connell returned to work on the third shift. According to Griffith, the new shift had no economic justification but was merely created as a gesture of good will to put the former strikers back to work and to boost employee morale. However, about a week after it began, the third shift was abolished and the former strikers were reassigned to jobs on the first and second shifts at Plant 1. At no time was O'Connell, who had been employed at Plant 2, offered a position on either shift at Plant 1. At no time after the morning of October 16 did O'Connell contact the Company to inquire about reinstatement. Finally, in February of 1980, all the replacements hired during the strike were laid off while the former strikers were retained.

## II. REFUSAL TO REINSTATE ECONOMIC STRIKERS

■ Although employees engaged in an economic strike are entitled to reinstatement upon making an unconditional offer to return to work, an employer may refuse to reinstate them if it has a "legitimate and substantial business justification" for doing so. *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967); *NLRB v. Mars Sales & Equipment Co.,* 626 F.2d 567, 572 (7th Cir.1980); *NLRB v. Murray Products, Inc.,* 584 F.2d 934, 938 (9th Cir.1978). Employment of permanent replacements has long been recognized as a legitimate business justification on the grounds that an employer has the right to continue business operations during a strike and presumably cannot obtain replacements for that purpose unless it offers them permanent employment. *NLRB v. Mars Sales & Equipment Co.,* 626 F.2d at 572–73; *see NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). However, an employer may not legitimately refuse to reinstate employees to positions which have not been filled by replacements. Thus, once it has been established that the employer refused to reinstate strikers who unconditionally offered to return to work, the burden shifts to the employer to prove it hired replacements on a permanent basis before it received the strikers' offer. *NLRB v. Murray Products, Inc.,* 584 F.2d at 939; *National Fruit and Vegetable Co. v. NLRB,* 565 F.2d 1331, 1337 (5th Cir.1978); *American Machinery Corp. v. NLRB,* 424 F.2d 1321, 1327 n. 9 (5th Cir.1970). Without such proof, the refusal to reinstate constitutes an unfair labor practice despite the absence of bad faith or anti-union animus. *NLRB v. Murray Products, Inc.,* 584 F.2d at 939.

At this stage of the proceedings, it is undisputed that Cutting refused to reinstate strikers who unconditionally offered to return to work on the morning of October 16, 1979. At issue is whether or not it

proved it hired permanent replacements before it received the strikers' offer and denied them reinstatement. The ALJ found it did not despite the fact Cutting produced five management witnesses who gave uncontradicted testimony that replacements were hired by the end of the afternoon of October 15. The ALJ discredited the parts of their testimony designating the 15th as the hiring date and concluded that the credible parts described events which took place on the 16th. The Board adopted the findings and conclusions of the ALJ on this issue, citing its policy "not to overrule an administrative law judge's resolutions with respect to credibility unless a clear preponderance of the evidence convinces us that the resolutions are incorrect."

 This court must determine whether the Board's findings are supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) (1976); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). While credibility findings made by an ALJ and adopted by the Board are to be accorded exceptional weight by a reviewing court, such weight only is given to the extent the findings rest explicitly on an evaluation of the demeanor of the witnesses. Sioux Products, Inc. v. NLRB, 684 F.2d 1251, 1253 (7th Cir.1982); NLRB v. Berger Transfer & Storage Co., 678 F.2d 679, 687 (7th Cir.1982); see Kopack v. NLRB, 668 F.2d 946, 953–54 (7th Cir.), cert. denied, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982). Moreover, all findings of fact, including those based on credibility, must be supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. at 496, 71 S.Ct. at 468; Kopack v. NLRB, 668 F.2d at 952. Thus, while the scope of our review necessarily is limited to the extent demeanor evidence is involved, the standard of review does not change.

 Cutting contends that findings contrary to direct, positive testimony cannot meet the substantial evidence standard. However, the absence of evidence in direct conflict with testimony given by witnesses for the party bearing the burden of proof does not preclude an ALJ from finding that the testimony is not credible and therefore insufficient to sustain the burden. See NLRB v. Walton Manufacturing Co., 369 U.S. 404, 407–08, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962); Glomac Plastics, Inc. v. NLRB, 592 F.2d 94, 99 (2d Cir.1979); White Glove Building Maintenance, Inc. v. Brennan, 518 F.2d 1271, 1273–74 (9th Cir.1975); Texaco Export, Inc. v. Overseas Tankship Corp., 477 F.Supp. 289, 297 (S.D.N.Y.1979); see generally, Davis, Administrative Law Text § 29.06 (3d ed. 1972); 5 Mezines, Stein & Gruff, Administrative Law § 51.02 at 15–34 to 15–36 (1982). Although such a finding is not entitled to the ordinary presumption of correctness, Medline Industries, Inc. v. NLRB, 593 F.2d 788, 795 (7th Cir. 1979) (quoting NLRB v. Huntington Hospital, Inc., 550 F.2d 921, 924 (4th Cir.1977)), it nevertheless may be upheld if the ALJ provides good reasons for rejecting the testimony and fully explains those reasons in light of the evidence. White Glove Building Maintenance, Inc. v. Brennan, 518 F.2d at 1273–74.

In this case, the ALJ explained his findings largely in terms of the inconsistencies he found in the testimony of Cutting's witnesses. One set of inconsistencies focused on the events of Monday morning, October 15. Supervisor David Whitecotton, who hired the replacements for Plant 2, testified he began calling job applicants "In the morning .... Probably around 8 o'clock. Again, I'm just guessing." However, Vice-President Gary Sharman testified that although he and Plant Manager Clyde Griffith discussed the matter several times over the weekend, the final decision to go ahead and begin hiring replacements was not made until he met with Griffith Monday "early morning maybe 9:00 or 10:00 when Clyde and I got around to it." Since Whitecotton acted pursuant to Griffith's orders, the ALJ concluded that he could not have begun hiring replacements at 8:00 Monday morning. Therefore, the ALJ reasoned, Whitecotton must have been describing his activities on Tuesday morning, October 16, instead of October 15 as he testified.

In reaching this conclusion, the ALJ found Whitecotton's testimony both definite and credible as to the time of day he began hiring replacements. The ALJ noted that Whitecotton gave an affirmative answer to a question which suggested he meant "approximately 8 o'clock, give or take 15 minutes," and placed great weight on his failure to alter his estimate later in response to the following:

Q. These times when you talk about 8 o'clock in the morning and things taking 5 minutes and so forth. You're approximating and guessing back to the correct times. You don't know the—

A. I can tell them at 1:45 I had everyone hired.

Despite the fact his testimony on the hiring date was discredited because Whitecotton, like the other defense witnesses, did not "impress" the ALJ "as being a candid witness," the ALJ credited his testimony on the time he began hiring on the basis he had "[no] reason to doubt that Supervisor Whitecotton was telling the truth when he recalled that he started hiring replacements at about 8 a.m."

Sharman, on the other hand, was only credited insofar as his testimony placed the time of the decision to begin hiring at a time no earlier than 9:00 Monday morning. The ALJ found Sharman and Griffith presented "conflicting versions" of the events since Sharman's testimony suggested he had made the decision himself after discussing it in detail with Griffith, whereas Griffith's testimony implied he had made the decision on his own, only mentioning having spoken to Sharman after consulting with Cutting's attorney and then only to inform Sharman of what he was doing about hiring replacements. Unable to resolve this conflict on the basis of the evidence, the ALJ found he could not deter-

mine when the decision to hire replacements was actually made. Nevertheless, he relied on Sharman's testimony for finding Whitecotton's testimony inconsistent with all the witnesses' testimony that the replacements were hired on October 15.

The only other evidence cited by the ALJ in support of his finding that the decision to hire was not made before 9:00 Monday morning was Griffith's interview with a reporter from the Hartford City newspaper. Former striker Pamela O'Connell testified she saw Griffith with the reporter some time between 7:30 and 8:00 Monday morning. Although Griffith could not recall the exact date he gave the interview, he admitted that the article which appeared in the newspaper Monday afternoon accurately reported him as having said "[The strikers] will be permanently replaced tomorrow if they don't report to work." Griffith, however, repeatedly denied having told the reporter or anyone else that the strikers had until Tuesday, October 16 to report back to work before they would be permanently replaced.[3] Nevertheless, the ALJ discredited his denials on the basis that his admission of the accuracy of the newspaper account was an admission he had set an October 16 deadline for returning to work. The ALJ further concluded that it was "clear that when Griffith gave the news story to the Hartford City News-Times reporter about 8 o'clock on Monday morning . . ., he had no intentions at the time of hiring replacements immediately." Consequently, the decision to hire replacements must have been made sometime later in the day along with plans to begin hiring the next morning.

The second set of inconsistencies cited by the ALJ concerned the testimony about the physical examinations which were allegedly

---

**3.** The opening paragraph of the article stated "A spokesman for Cutting, Inc. said striking members of United Paperworkers Local 1292 will be permanently replaced if they fail to report to work Tuesday." However, Griffith only was specifically questioned on the following statement which appeared later in the article: "According to Griffith, of the fifty-three employees at the plant, only eighteen remain

off their jobs, those will be permanently replaced tomorrow if they don't report to work he said." Griffith testified several times that the latter statement was an accurate quotation, although he later attempted to qualify his answers by saying he did not recall saying "tomorrow." *See* note 7 *infra* discussing the admissibility of this evidence.

scheduled for the replacements before they began work. Cutting's records showed that 12 of the 13 new employees hired as replacements began work on Wednesday, October 17, and that one employee began work on Thursday, October 18. Personnel Assistant Zella Taylor testified that the reason for the delay was that all new employees were required to take and pass a physical before they could begin work, and that she was unable to schedule them for all the replacements on October 15, the day they were hired. This testimony was corroborated by that of Whitecotton and James Sandoe, the Production Manager who hired the replacements for Plant 1. The ALJ, however, found that Sandoe's testimony was inconsistent with the October 15 hiring date because he testified he told replacements they "had to report in the next day at 8:00 o'clock and then they would be scheduled for their physicals and report right after their physicals to go to work." The ALJ construed this to mean that the replacements were to receive their physicals and begin work on the same day. Since they did not begin work until October 17, he concluded they must have been hired on October 16.

The ALJ also found a discrepancy between Sandoe's and Taylor's testimony. Taylor testified she called the Company doctor on October 15 to schedule the physicals. When asked whether all the physicals were given on the 15th, she replied, "No, some of them were on the 16th and that was the reason for the delay for reporting on the 17th." The ALJ found that this testimony implied that some replacements were given physicals on the 15th and that this was inconsistent with Sandoe's testimony because his indicated that the replacements he hired did not report to the personnel office to obtain papers for getting physicals until the day after they were hired. The ALJ also noted that the only personnel file examined at the hearing revealed that the employee, Chalmer Williamson, did not receive his physical until October 30 although he began work on October 17. Since O'Connell also testified she did not receive her physical until about a month after the date she was hired in 1978, the ALJ questioned the credibility of the testimony that physicals were required before new employees could start work.

■■■ Having carefully examined the record below, we conclude that the ALJ's findings are not supported by substantial evidence. Viewed in its entirety, the testimony of the witnesses does not contain the kind of "important discrepancies" sufficient to support a finding discrediting direct, uncontroverted testimony. *White Glove Building Maintenance, Inc. v. Brennan,* 518 F.2d 1271, 1274 (9th Cir.1975). In several instances, the ALJ has read testimony out of context or has failed to take into account other evidence which conflicts with the conclusions drawn. This kind of selective analysis is prohibited under the standard set forth in *Universal Camera.* Moreover, it is particularly inappropriate in a case where the inferences drawn are contrary to direct, positive testimony. In order to support such inferences, the evidence must be internally contradictory or inherently improbable. *White Glove, supra; Glomac Plastics, Inc. v. NLRB,* 592 F.2d 94, 99 (2d Cir.1979); *Stone & Webster Engineering Corp. v. NLRB,* 536 F.2d 461, 466 (1st Cir.1976). We do not find the evidence cited by the ALJ sufficient to meet this test. Nor do we find he has relied on demeanor evidence which, considered along with the consistency and inherent probability of the testimony, is sufficient to support a conclusion that the witnesses' testimony is "not only false, 'but that the truth is the opposite of [their] story.'" *Glomac Plastics, Inc. v. NLRB,* 592 F.2d at 99 (quoting *NLRB v. Walton Manufacturing Co.,* 369 U.S. at 408, 82 S.Ct. at 855). Consequently, we must reject the finding that Cutting unlawfully refused to reinstate the former economic strikers.

Much of the ALJ's reasoning is based on his finding that Whitecotton began hiring replacements at approximately 8:00 a.m. Viewed in its entirety, however, Whitecotton's testimony lacks the degree of accuracy and certainty implicit in the ALJ's finding that it was inconsistent with Sharman's testimony. At the outset of his testimony on

the point, Whitecotton said he was "just guessing," and it was the Board's General Counsel, not the witness, who suggested the qualification, "Okay, approximately 8 o'clock, give or take 15 minutes."[4] Moreover, Whitecotton's testimony on redirect did not, as the ALJ suggested, affirm that estimate or render it more certain.[5] The focus of the redirect examination was on the time Whitecotton finished hiring, not the time at which he began. Even as to the former time, Whitecotton maintained he was only giving an approximation. Under these circumstances, we cannot find that the testimony was so definite that it could be reasonably construed as evidence contradicting all the testimony that replacements were hired on October 15.

Even if Whitecotton's testimony could be considered accurate, the apparent discrepancy with Sharman's testimony fails to support the inference that the decision to hire and the actual hiring occurred on two different days. Under the ALJ's theory of credibility, Whitecotton's testimony was credible as to the time of day he began hiring but not the date; Sharman's was credible as to both the time of day and the date the decision was made—but only to the extent it placed it after 9:00 a.m. Monday—but was not credible as to the date the hiring actually took place. The ALJ gave no reasons for these distinctions, merely concluding later in the findings that none of Cutting's personnel "impress[ed]" him "as being a candid witness" so that he could "discredit their testimony that the hiring was done on October 15." Assuming that such conclusory remarks are sufficient to indicate reliance on demeanor evidence,[6]

4. Whitecotton testified on cross-examination:

Q. We know you finished about 2 p.m. on October 15th, when did you begin interviewing?
A. In the morning.
Q. When? What time?
A. Probably around 8 o'clock. Again, I am just guessing.
Q. Okay, approximately 8 o'clock, give or take 15 minutes.
A. Um-hum.
Q. Went right through the noon hour?
A. Um-hum.

5. Whitecotton's entire testimony on redirect was as follows:

Q. These times when you talk about 8 o'clock in the morning and things taking 5 minutes and 2 o'clock in the afternoon and so forth. You're approximating and guessing back to the correct times. You don't know the—
A. I can tell them that at 1:45 I had everyone hired.
Q. You're speaking as to your recollection now, about what happened back then?
A. Yes.
Q. And those times can vary some from what you testified?
A. Sure.
ALJ. I don't understand your testimony now. You told us before that you hired everybody by 2 o'clock.
A. Yes, sir.
ALJ. Now, are you saying that it could be 15 minutes earlier or 15 minutes later, or some—
A. Yes, sir. I'm saying that is an approximation.
ALJ. —Or it could have been 1 o'clock or it could be 4 o'clock?
A. It was before I would have left the regular work day, which is at 3 o'clock. If, as the ALJ asserted, there was no reason to doubt that Whitecotton was telling the truth about the time of day these events occurred, then this testimony supports rather than detracts from the view that Whitecotton's statement was only a rough approximation. Moreover, using the ALJ's reasoning, one might conclude that Whitecotton's failure to respond to the ALJ's suggestion that he could have finished hiring as early as 1 o'clock indicated that his estimates could be off as much as 45 minutes—the time difference between 8:00 "give or take 15 minutes" and 9:00.

6. Although the ALJ noted that Griffith "did not impress me as being a candid witness," he only mentioned the other witnesses in the context of describing Taylor's testimony: "Like the other four defense witnesses who claimed that the hiring was done on October 15, she did not impress me as being a candid witness. I discredit their testimony that the hiring was done on October 15." Given its context and the overall reliance on inferences drawn from the substance of the testimony, we do not believe the statement about the witnesses' lack of candor is the kind of explicit, demeanor-based credibility finding entitled to exceptional weight under *Kopack v. NLRB,* 668 F.2d 482 (7th Cir.1982). [Compare the ALJ's observation that "O'Connell impressed me by her demeanor on the stand, particularly during her cross-examination, as being a most sincere witness, doing her best to give an accurate account of what happened."] An ALJ may not

they provide no basis for assessing the relative credibility of the witnesses or particular parts of their testimony.

■ The evidence on the record also fails to support the ALJ's credibility choices. Whitecotton's testimony only appears to conflict with the testimony of one of the four witnesses. Sandoe, whose testimony was considered critical on the issue of the physicals, testified he began calling applicants "on the afternoon of the 15th." This was consistent with Sharman's testimony that the decision to hire was made at 9:00 a.m. It also was consistent with Griffith's testimony that he spoke to Sharman about the decision "sometime in the morning." The ALJ offered no reason for crediting Whitecotton's testimony instead of discrediting it or discounting its accuracy in light of the consistency of the testimony of Sandoe, Sharman, and Griffith. Nor did he give any reason for crediting Sharman's testimony insofar as it conflicted with Whitecotton's but not insofar as it differed from Griffith's. Where an ALJ's theory of credibility is based on inadequate reasons or no reasons at all, his findings cannot be upheld. *White Glove Building Maintenance, Inc. v. Brennan*, 518 F.2d 1271, 1274 (9th Cir.1975); *see also NLRB v. E-Systems, Inc.*, 642 F.2d 118, 120 (5th Cir.1981); *Custom Recovery, Division of Keystone Resources, Inc. v. NLRB*, 597 F.2d 1041, 1045 (5th Cir.1979); *NLRB v. Florida Citrus Canners Cooperative*, 311 F.2d 541, 543 (5th Cir.1963) (on remand from *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962)).

The ALJ's analysis of other portions of the testimony about the events of October 15 also fails to support his conclusions. Of course, if Whitecotton's testimony about the time he began hiring cannot be considered accurate, there is no inconsistency with Sharman's and the confusion as to precisely how and when the decision to hire was made on Monday morning is of little signifi-

cance. Nevertheless, to the extent the ALJ relied on Sharman's and Griffith's testimony about the decision as support for his general characterization of the testimony as inconsistent, we cannot accept those findings. The supposed conflict in the "versions" given by Sharman and Griffith was based largely on the ALJ's assumption that Cutting "withheld hiring any replacements" after it began advertising in the newspaper under the heading of "Immediate Hiring" on Thursday, October 11, the first day of the strike. There was no evidence supporting that assumption other than the fact no replacements were hired until October 15. Nevertheless, the ALJ implicitly discredited Griffith's testimony that the decision to hire replacements was made on Wednesday, October 10, after the negotiations broke down, and ignored Sharman's testimony that he and Griffith had discussed the matter several times over the course of the following weekend. Viewed in the context of this evidence, the testimony concerning the decision made Monday morning referred to nothing more than the decision to commence hiring at that particular time rather than a decision on the merits of hiring replacements. Consequently, Sharman's testimony that he spoke to Griffith about the final decision and directed him to "go ahead and hire people" did not significantly differ from Griffith's testimony that he informed Sharman about what he was doing about hiring the replacements, presumably pursuant to the plans made over the weekend. Both witnesses could have been describing a brief conversation, and the difference in their recollections of who made the decision to start the actual hiring process was a minor discrepancy in light of the nature of the decision.

Similarly, Griffith's statement to the press does not support the ALJ's conclusion that he had no intention of hiring replacements.[7] To announce early in the morning

make his credibility findings unassailable by simply invoking "the right incantation" to the witnesses' demeanor. *Id.* at 953–54 (quoting *Penasquitos Village, Inc. v. NLRB*, 565 F.2d

1074, 1086 (9th Cir.1977) (J. Duniway, dissenting in part)).

7. For the purposes of this discussion, we are assuming that the newspaper article was ad-

that strikers "will be permanently replaced tomorrow if they don't report to work" is not inconsistent with proceeding to contact job applicants and hiring them that same day. Given that job advertisements had been running since Thursday and that the decision to hire replacements was made at that time, Monday was a logical time to review the applications and commence hiring. Griffith's statement could be easily construed to mean that Cutting was simply going ahead with its plans.

Finally, we do not find that the testimony concerning the physicals constitutes substantial evidence inconsistent with the October 15 hiring date. Viewed in its entirety, Sandoe's testimony about when the replacements were to report to work was ambiguous at best:

> I asked them to come in the next morning at 8:00 o'clock to see the Personnel Director, that they had been hired, but they had to come in and fill out their forms before they could go to work. . . . I need you to come in at 8:00 o'clock tomorrow morning to report to work and you will have to see the Personnel Director and fill out forms before you can proceed. . . . Like I said, the next day they had to all come in and report at 8:00 o'clock and then the Personnel Director would take care of them. . . . I said they had to report in the next day at 8:00 and then they would be scheduled for physicals and report right after their physicals to go to work.

Taylor was not questioned about the time or the procedures for this part of the hiring process, and the ALJ specifically found that Williamson, the employee who received his physical on October 30, went to Plant 2 and filled out a W-4 form on Tuesday, October 16. This evidence was consistent with Sandoe's and Taylor's testimony. Whitecotton's testimony also was consistent with Sandoe's. Whitecotton testified he told the replacements:

> I would probably have their physicals scheduled for Tuesday the 16th. If I didn't have one scheduled, that I could go ahead and let them work anyway. . . . [on] Wednesday the 17th.

The ALJ failed to mention this testimony or explain why it should be discredited and why the ambiguity in Sandoe's should be construed in favor of a meaning inconsistent with Whitecotton's unambiguous statements. Although Whitecotton's testimony was arguably inconsistent with Taylor's that "some of [the physicals] were on the 16th" (implying that some were on the 15th), Taylor's testimony could just as easily have been discredited as Whitecotton's.[8] In light of these conflicting inferences, the ambiguity upon which the ALJ's inferences were based, and the ALJ's failure to account for all the relevant evidence, we cannot conclude that his findings were based on evidence such "as a reasonable mind might accept as adequate to support a conclusion." *Kopack v. NLRB*, 668 F.2d 946, 951 n. 3 (7th Cir.1982) (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459).

Since we are unable to uphold the findings on the basis of the inconsistencies cited by the ALJ, we do not find the ALJ's impression of the demeanor of the witnesses and his theory of probability sufficient, by themselves, to support the conclusion

---

missible. However, we agree with Cutting that its use, even for impeachment purposes, raises serious admissibility problems. *See Pallotta v. United States*, 404 F.2d 1035, 1038 (1st Cir. 1968); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 513 F.Supp. 1100, 1232 n. 198 (E.D.Pa.1981).

**8.** The ALJ, in fact, found that Taylor's testimony about the hiring date was impeached because at one point she purported to read the dates from Company accounting records and later admitted there were no records of the hiring date, only the dates the replacements actually started work. Having examined this testimony in its context in the record, we cannot accept the ALJ's conclusion in light of the general confusion at the hearing as to what records and dates were requested from Ms. Taylor. However, we do note that the ALJ's general perception of Taylor as an unreliable witness was inconsistent with his crediting her testimony over Sandoe's and Whitecotton's in the analysis discussed above. *Cf. Sioux Products, Inc. v. NLRB*, 684 F.2d 1251, 1256 n. 6 (7th Cir.1982) (inconsistent crediting of parts of a witness' testimony).

that the replacements were hired on October 16. An observation that five witnesses did not impress one as being candid is not the kind of detailed, explicit credibility finding required by *Kopack* and *White Glove Building Maintenance, Inc., supra.* Nor is it enough under *Walton,* which suggests that in some cases the demeanor of a witness

> "* * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one who has a motive to deny, may be uttered with such hesitancy, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Dyer v. MacDougall,* 2 Cir., 1953, 201 F.2d 265, 269.

*NLRB v. Walton Manufacturing Co.,* 369 U.S. at 408, 82 S.Ct. at 855.

▮ Similarly, this is not a case in which the substance of the testimony is inherently implausible or unworthy of belief. *See, e.g., Texaco Export, Inc. v. Overseas Tankship Corp.,* 477 F.Supp. 289, 297 (S.D.N.Y. 1979). Whatever doubts may have been raised by the circumstances of the hiring were adequately resolved by the witnesses' explanations for the purposes of sustaining the Company's burden of proof. An employer need not provide exhaustive proof corroborating the testimony of its witnesses to meet its initial burden. *White Glove Building Maintenance, Inc. v. Brennan,* 518 F.2d at 1275–76; *see also H. & F. Binch Co. v. NLRB,* 456 F.2d 357, 361–62 (2d Cir.1972) (proof of hiring of permanent replacements must be viewed in a practical frame). To require otherwise, in the absence of evidence directly or indirectly contradicting the proof, would be a gross misconception of the standard and an invitation to wholesale discrediting of uncontroverted testimony.

Given the overall consistency and plausibility of the testimony of Cutting's witnesses, we must reject the ALJ's finding that it was not credible and accept its proof it

hired permanent replacements before the strikers unconditionally offered to return to work. Cutting's undisputed illegal activities, not contested here, do not commend this employer for any indulgence from this court. Nevertheless, what Cutting did in this particular instance, as shown by the unmanipulated evidence, cannot itself be faulted.

Given this conclusion, we need not address the propriety of the ALJ's award of back pay to former strikers other than O'Connell. As to O'Connell, we find no violation of sections 8(a)(1) and 8(a)(3) of the Act in Cutting's refusal to reinstate her on October 16, 1979 after the permanent replacements had been hired. Since O'Connell rejected the offer of a job on the newly formed third shift, and there was no evidence of any subsequent hirings or future openings, there were no other instances of denial of reinstatement and hence none which were unlawful. Consequently, we do not reach the issue of whether O'Connell's "self-termination" extinguished her rights to reinstatement and the Company's obligation to put her on a priority list for hiring under *Laidlaw Corp. v. NLRB,* 414 F.2d 99 (7th Cir.1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). Enforcement is denied those parts of the Board's order finding Cutting unlawfully refused to reinstate O'Connell or any other former economic strikers, granting reinstatement to O'Connell, and awarding back pay to O'Connell and the other former strikers.

### III. SCOPE OF CEASE AND DESIST ORDER

On review Cutting does not contest the Board's findings regarding the other violations with which it was charged. However, it argues the Board was not justified in modifying the ALJ's order to require it to cease and desist from "in any other manner" interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed them under section 7 of the Act.[9] The Board found the broader

---

**9.** The ALJ's recommended order contained the language: "In any like or related manner, inter-

order was warranted "in view of Respondent's multiple and flagrant violations of the Act." Cutting, however, contends the order was improper because it subjects it to contempt proceedings for any further violation of the Act, including violations similar to those alleged but not proven in this case.

Before reaching the merits of this contention, we must first determine whether the issue is properly before this court. The General Counsel argues that Cutting is barred from raising the issue here because it failed to file a motion for reconsideration with the Board pursuant to 29 C.F.R. § 102.48(d)(1). *See NLRB v. Sambo's Restaurant, Inc.,* 641 F.2d 794 (9th Cir.1981). Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), provides:

> No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

Extraordinary circumstances, however, exist if "there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time." *NLRB v. Allied Products Corp.,* 548 F.2d 644, 654 (6th Cir.1977); *accord Universal Security Instruments, Inc. v. NLRB,* 649 F.2d 247, 260 (4th Cir.1981). In this case, our decision overturning the Board's finding of unlawful refusal to reinstate the former economic strikers was not available to Cutting as a basis for objecting to the scope of the cease and desist order as modified by the Board. Consequently, we find the Company was excused for failing to file a motion for reconsideration objecting to the Board's *sua sponte* adoption of the broader language.

Given our disposition of the refusal to reinstate charges, we find that the "in any other manner" language is unnecessarily broad. The conduct found in violation of the Act was not so egregious or widespread

to justify such an order. *See Wyman-Gordon Co. v. NLRB,* 654 F.2d 134, 146–47 (1st Cir.1981); *Red Oaks Nursing Home, Inc. v. NLRB,* 633 F.2d 503, 511 (7th Cir.1980); *cf. NLRB v. Blake Construction Co.,* 663 F.2d 272, 285 (D.C.Cir.1981) (employer's actions rose to the level of "a general disregard for the employees' statutory rights"); *NLRB v. Union Nacional de Trabajadores,* 540 F.2d 1, 11 (1st Cir.1981) (proclivity to violate § 7 rights and general disregard for the authority of the Act). Consequently, we hold that the portion of the cease and desist order pertaining to the general restriction on other violative conduct should be phrased in accordance with the original "in any like or related manner" language proposed by the ALJ.

## IV. CONCLUSION

Enforcement of the order of the National Labor Relations Board is denied as to those portions relating to the refusal to reinstate O'Connell and the other former economic strikers. The remainder is enforced except as modified above.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.

fering with, restraining, or coercing its employees in the exercise of the rights guaranteed

them by Section 7 of the Act."